WILLIAM T. STOPFORD, PLAINTIFF-APPELLANT, v. BOON-TON MOLDING COMPANY, INC., A NEW JERSEY CORP-ORATION. JOHN W. MECOM, JOSEPH D. KOZA AND M. A. CLIFTON, DEFENDANTS-RESPONDENTS.

Argued March 3. 1970—Decided June 1, 1970.

170

172

*Mr. David W. Hanis* argued the cause for appellant.

*Mr. George B. Gelman* argued the cause for respondents (*Mr. John J. Baldino* on the brief; *Messrs. Calissi, Gelman, Cuccio & Klinger,* attorneys).

The opinion of the court was delivered by

FRANCIS, J. This case involves a damage claim based upon an alleged anticipatory breach by defendant-employer Boonton Molding Company of plaintiff-employee William T. Stopford's vested contractual right to a lifetime pension. Defendants, Mecom, owner of all the stock of Boonton except for a few qualifying shares, and Koza and Clifton, officers of Boonton, were charged with the assumption of individual liability for payment of the pension. After trial, a jury verdict of $68,000 was returned against Boonton, Mecom and Koza. The claim against Clifton was dismissed with prejudice by consent. On appeal, the Appellate Division in an unreported *per curiam* opinion reversed the judgment below and remanded the cause for entry of judgment in favor of all defendants. This Court granted plaintiff's application for certification. 55 *N. J.* 311 (1970).

Plaintiff Stopford entered the employ of Boonton Molding Company on or about January 1, 1944. At that time Boonton was owned by George Scribner. About 1956 defendant Mecom, a resident of Texas and an owner of a number of substantial business interests in his home state and elsewhere, and two associates acquired the company. Scribner remained as the manager for five years thereafter. After Scribner left around 1960, the business was operated as a

limited partnership by Mecom and an associate, Mabel; Stopford was made general manager. In December 1961 the company was incorporated and Stopford was appointed president.

At incorporation, Mecom, then owner of the company, acquired all of its stock except a few qualifying shares. In addition he became a director and chairman of the executive committee of the board of directors with authority to act for the board. It is beyond dispute that after December 1, 1961, although the business existed in corporate form, Mecom considered that he owned it and had absolute control over it. As he put it, he operated the company as his "own personal property"; what he said controlled. He did not have to consult the board of directors; he made the decisions, whatever their nature, and passed them on. He said, "I am in charge. I operate it [the company] as a business, as an individual." In fact, he "appointed" Stopford as president of Boonton in a telephone call from Texas. Significant in this connection is a note included in Boonton's financial statement of March 31, 1964 that "[u]nder the provisions of Subchapter S of the 1954 Internal Revenue Code, the Company, with the consent of its stockholders [Mecom], has elected [since 1961] to be treated as a 'Small Business Corporation' and, as such, any taxable income or losses are assumed by the individual stockholders." Thus losses sustained by Boonton during Stopford's tenure as president were included for tax purposes with the gains or losses from Mecom's manifold individual enterprises elsewhere, particularly in his home state, Texas.

In the early part of Stopford's regime as president, a union instituted an effort to organize the Boonton production workers. Stopford and John Belding, a vice-president and director of the company, discussed means of avoiding unionization and of providing an employment inducement as well as an incentive for long-term service. One method they decided upon was the establishment of two pension plans, one for the production workers and the other for per-

sonnel including officers of the company who would not be included in the production workers' bargaining unit. After obtaining outside expert assistance two separate plans were prepared, one for production workers which was to be non-contributory, the other for the remaining personnel, which was substantially the same in format, except that it called for contributions by the covered employees as well as by the company.

Around the spring of 1962 the two plans were presented by Stopford and Belding to Mecom, Mrs. Mecom, also a Boonton director, and Mecom's attorney, who had come up from Texas for the meeting. There is no doubt that at this time, in addition to the unionization activity, the company was suffering from financial problems. However, as the evidence reveals, Mecom was shown that if the plans were adopted certain substantial existing employee fringe benefits would be eliminated resulting in a net savings to the company of $55,000 annually over the cost of funding the pensions. Substantial testimony appears in the record that at this meeting Mecom — whose word was law — approved the plans and gave the word to go ahead. There is also some testimony that Mecom indicated he wanted to study the matter further.

There is no doubt that thereafter two pension plans were installed by Boonton and printed copies thereof distributed to the affected employees. One plan, covering all employees, was denominated the "Pension Plan"; the other, covering only the salaried employees, was called the "Pension Plan Contributory Group." The only difference between the two plans, except for the amount of benefits payable, was that the employees who qualified for the contributory plan were required to contribute to the pension fund. The non-contributory plan became effective on June 1, 1962, and the contributory plan on January 1, 1963. Both provided for the creation of a pension fund and the appointment of a trustee to hold the fund, i. e., to receive company and employee contributions and pay the pensions as employee eligi-

bility arose. Such a trust agreement between the company and a trustee was executed on January 1, 1963.

The preamble of the trust agreement recited that:

[I]t is the intention of the Company, in order to reward its present and future employees, who may qualify under this agreement, for faithful service rendered and to be rendered to the Company, to create a Pension Fund, and to assure, to the extent hereinafter provided, the sustenance of such participating employees in their old age, * * *.

The agreement specified that upon its execution, the company:

[s]hall pay into the Pension Fund, all monies required by it to be contributed to said Pension Fund, according to the terms and conditions thereof, and all sums contributed and collected by it from employees, according to the terms and conditions of said Pension Fund. * * *

The direction and management of the fund and the administration of the pension plans were committed to the "Administration Committee" exclusively, the chairman and members of which were to be appointed by the company.

The contributory plan, with which we are concerned in the present case, required each participating employee to contribute 4% of his annual compensation in excess of $4800 during each year of membership. It then provided that:

The Company *shall* bear the remaining cost of the Plan, and the Company *shall* contribute to the Trustee such amounts at such times as shall be decided by the Company. (Emphasis ours.)

The plan fixed the normal retirement date of a participant as the first day of the month next following his 65th birthday, provided he had completed 15 years of continuous service. Provision was included also for early retirement. Its text said:

A Participant may, with the consent of the Employer, retire any time after attainment of age 60 and before his Normal Retirement Age, provided such Participant has completed at least 15 years of Continuous Service.

The early retirement benefit was specified explicitly. Such a retiree was to receive a monthly benefit which would commence on his retirement date and which "shall be continued on the first regular Company payday of each month thereafter during his lifetime." The amount of the monthly benefit was to "be equal to the accrued normal retirement benefit reduced by one-half of one percent (½%) for each month by which the age of the applicant at Early Retirement Date is less than his age at Normal Retirement Date."

In addition to the years of service and age requirements as qualifications for a pension, the plan provided that if a retired employee, whose benefit is "vested" enters the employ of a competitor within six months after termination of his company employment, or if he "divulges to any competitive endeavor any information of a confidential nature with respect to the processes, operations or contracts" of Boonton the portion of his pension based upon company contributions to the fund "shall be forfeited."

The plaintiff's proof revealed that after the contributory plan became effective on January 1, 1963, the covered employees began to make the required contributions to the fund. It is undisputed that, except for those who had already been retired, the contributions continued until the plan was terminated by unilateral action of Boonton on September 30, 1966. Although, as noted above, Boonton had agreed "to bear the remaining cost of the [pension] Plan," i. e., the sum necessary to provide the benefit payments, no contributions had been made by it to the fund or to the trustee thereof at the time of the attempted termination. The termination action allegedly was taken at a special meeting of the board of directors held in Houston, Texas. At the meeting the board consisted of John W. Mecom, Mary Elizabeth Mecom, his wife, John W. Mecom, Jr., his son, and

Joseph D. Koza, one of the defendants herein. It was this purported termination which gave rise to the present litigation.

At the trial, Boonton raised an issue as to whether the pension plan had ever been formally or properly adopted. That issue, among others, was submitted to the jury which found in favor of the plaintiff. On appeal to the Appellate Division and to this Court the issue has been abandoned. We deem defendants' decision in that regard to be a sensible one. Adoption of the plan was clearly established. Even if there were a jury question on the subject a contrary verdict would be against the overwhelming weight of the evidence.

In 1964 Boonton had been losing money, and in February of that year Mecom, as sole stockholder and chairman of the executive committee of the board of directors, authorized the defendant Joseph D. Koza to assume complete responsibility for the operation of the Boonton Molding Company and to take "such action as you deem necessary to see that it is operated in the most efficient and economical manner." His authority was to cover "all aspects and phases of personnel, production and financing." In explaining the scope of this authority Mecom testified that since he (Mecom) owned the business and considered himself "in charge," he gave Koza "complete authority" to act in his place and stead.

In spite of Koza's presence, Boonton's business problems continued. In December 1964 apparently Koza and Mecom decided to terminate Stopford's connection with the company. Accordingly, on Saturday, December 19, 1964, Koza (who actually had no official title or position with the company) arranged a meeting with Stopford. At the meeting, according to Stopford, Koza said he had "bad news" and that Mecom wanted Stopford retired as of January 1, 1965. A discussion ensued about severance pay and early retirement under the pension plan. There is no doubt that Stopford was then qualified by age and years of service for such retirement. An agreement was reached for three months

severance pay and for early retirement as of January 1, 1965. Stopford agreed to assist in the orderly transfer of the office of president and the active management of the business. In return he was to receive his regular salary for three months and commencing with April 1965 he would receive the regular monthly retirement benefit to which he was entitled under the plan. Koza said he would have the early retirement benefit calculated.

William H. Evans, the controller and secretary of the company, testified that on Saturday, December 19, 1964 a meeting was called of the special management committee (which had been formed by Koza and of which Evans was a member). He attended and there learned that Stopford was being retired. Later the same morning Koza came to Evans' office and asked him to prepare a statement showing the monthly benefit Stopford would be entitled to under the pension plan. In about 20 minutes Evans prepared a pen and ink statement detailing the calculations showing the monthly pension benefit due Stopford under the plan. The amount established was $296.17 monthly. Evans initialed and dated the statement and hand-delivered it to Koza. A few days later Koza returned the statement to Evans. Before handing it back he wrote at the bottom left-hand corner: "Pay Wm. Stopford 3 months salary. Joe Koza." He then told Evans to see that the instructions were carried out. Stopford testified that on Monday, December 21 he obtained a copy of the statement from Evans and immediately noted on the upper right-hand corner "Pension Agreement with B. M. Co. authorized by Joe Koza, Representative of John W. Mecom, Houston, Texas."

On this appeal Stopford's claim that he was granted early retirement by Boonton is not contested.

Stopford left the company on January 1, 1965. He received monthly salary checks as severance pay for January, February and March. On March 31, 1965 a memorandum was sent by Evans' chief accountant who was a member of the Pension Plan Administrative Committee to the ap-

propriate officer of Boonton advising that for pension payment purposes Stopford was retiring effective April 1, 1965 and was to participate as a pensioner *"on our payroll"* (emphasis ours) from that date and to "continue as long as the pension plan exists." Pension payments were made on a regular monthly basis thereafter through September 1966. On October 18, 1966, Stopford was notified that by a resolution adopted September 30, 1966 the board of directors of Boonton had terminated the pension plan. The letter of notification said that the policy of the company had changed and "no more payments will be forthcoming;" and "any inconvenience that this action may cause you personally" was sincerely regretted.

The September 30 company resolution recited that the action terminating the pension plan was taken pursuant to Article XX B thereof. Article XX says:

A. AMENDMENT OF THE PLAN
The Company shall have the right at any time by action of its Board to modify, alter or amend the Plan *in whole or in part;* provided, however, * * * that the amount of benefits which at the time of any such modification, alteration or amendment shall have accrued for the Participants * * * under the Plan shall not be affected thereby * * *." (Emphasis ours.)

B. TERMINATION OF THE PLAN
1. The Trust established under Article XVIII hereof shall be an irrevocable Trust and the Company expects to continue the Plan indefinitely. However, the Company reserves the right to terminate the Plan and its Contributions thereunder at any time by action of its Board. * * *"

This article further provides that, if termination occurs, no part of the fund is to be returned to the company but is to be allocated first, to the payment of participants' contributions plus interest; second, to provide the benefits payable from the fund to retired participants, to contingent annuitants (as described in the plan) who are in the course of receiving benefits from the fund on the date of termination, and to participants who, on the date of termination have reached their normal retirement date but have not re-

tired; and third, to provide certain other benefits for participants which need not be detailed here. Finally the article specifies that if the balance of the fund remaining for allocation as just outlined is insufficient for payment in full of benefits in the three categories, the individual allocations shall be reduced *pro rata,* and no allocation shall be made for any subsequent category.

Since Boonton had defaulted with respect to the making of contributions to the pension fund, the only moneys contained therein on the date of termination were the contributions made by the covered employees since the inception of the plan. The record shows that the monthly pension benefits paid to Stopford from the date of his retirement to September 30, 1966 came from the company's regular payroll account. Upon termination of the plan, the employee contributions which had accumulated in the fund were returned to them on some basis not explained at the trial. No part of this sum was paid to Stopford. Thus, when the plan was ended no money remained in the fund with which to continue payment of his pension, and Boonton denied any further liability to do so.

In this damage action, Stopford claimed that he had a vested contractual right to a lifetime pension of $296.17 per month, and that Boonton's termination of the payment as of the end of September 1966 constituted a total anticipatory breach of its binding obligation. Accordingly, at the trial, he sought a judgment (1) for the sum of the monthly payments which had accumulated as of that date, and (2) for the sum required at his age to purchase an annuity contract which would produce $296.17 monthly and be exhausted at the end of his life expectancy as set out in a standard mortality table, and (3) a separate sum representing the income tax liability to which he would become subject by reason of receiving either of the lump sum values of his pension in one taxable year.

Proof was offered through a life insurance expert that it would cost $8399.29 to purchase an annuity contract that

would provide monthly payments of $296.17 from October 1, 1966 through December 1968, the probable date of entry of judgment after the trial. The expert testified also that a payment of $46,404.51 would be necessary to purchase an annuity contract to provide $296.17 monthly over Stopford's life expectancy and be exhausted at the end of that period. An income tax expert was produced also and allowed to testify over defendants' objection as to the tax impact if the full lump sum recovery of $54,803.80 ($8399.29 + $46,404.51) which was being sought by plaintiff was allowed by the jury. Using the previous year's income as a base, adding the $54,803.80 recovery, and deducting assumed litigation costs, the increased tax liability would be $12,984. On cross-examination the expert said further that using the same assumptions with respect to Stopford's annual income over the years of his expectancy and assuming he received annual pension payments of roughly $3600 ($296.17 monthly), Stopford would have an annual tax liability on the $3600 of $796. Rounding the figure to $800 he would pay approximately $11,200 in taxes on the pension over the expectancy period.

Defendants objected to consideration of the alleged increased tax liability as an element of damage. Further they pointed out that in any event the difference between the assumed tax liability on a lump sum recovery of $54,803.80 and the annual tax liability on the pension if paid monthly over the expectancy would be only approximately $1800.

Defendants contended further that if damages were to be assessed, the jury in its discretion should be allowed to use for calculation purposes the present value of a dollar at plaintiff's age as shown in the Mortality Table in evidence. The present value of such a dollar invested at $3\frac{1}{2}\%$, as shown there, being $9.9658, it was defendants' position that $9.9658 should be multiplied by the annual pension, thus producing $35,192.83. (We compute it to be $35,418.85 using monthly payments of $296.17.)

In charging on damages the trial judge submitted the theories of both plaintiff and defendants to the jury. In addition he advised them that they could apply another measure. Since the life expectancy table showed plaintiff's life expectancy to be 14.69 years, in their discretion they would be justified in multiplying the annual pension of $3554.04 by 14.69 years in order to determine the actual loss. He gave the jury the product of this calculation as $52,208.85, saying they might accept it but it was not conclusive on them. This was objected to by defendants as being in excess of present value of the pension. We agree that it was improper to permit the jury to consider that thesis. However, as will appear, it is obvious that the jury did not utilize it in reaching the verdict. Objection was likewise made to the authorization to consider plaintiff's additional income tax liability.

The jury returned a verdict in favor of the plaintiff and against all three defendants in the amount of $68,000. (The individual liability of Mecom and Koza will be dealt with later in this opinion.) It seems obvious, as the Appellate Division observed, that in computing the verdict the jury accepted and rounded out the figures given by plaintiff's life insurance and tax experts. ($8399.29 accumulated payments to trial, $46,404.51 cost of annuity + $12,984 tax liability = $67,787.80.)

## I

## LIABILITY OF BOONTON

On the basic liability aspect of this appeal Boonton raises a single issue. As expressed in its brief, the "question here is simply whether the Company had, as a matter of law, the right to terminate the pension plan pursuant to the provisions therefor in the written instruments themselves."

The contributory pension plan involved here is not a mere gratuity, the benefits of which depend upon the bounty of the employer. It is an offer to pay a pension upon compli-

ance by the employee with terms and conditions set forth therein. The pertinent terms and conditions so far as Stopford is concerned were continuance in Boonton's employ until the required age and period of service were reached, payment of the stipulated contributions, obtaining company agreement for early retirement, and upon retirement, agreeing to refrain from competitive employment for six months and not to divulge to a competitor any information of a confidential nature respecting the processes, operations or contracts of Boonton. Satisfaction of those requirements constituted adequate consideration and brought about a vesting of the right to the lifetime benefits as prescribed by the plan. *Russell v. Princeon Laboratories, Inc.*, 50 *N. J.* 30, 35 (1967); *Specht v. Eastwood-Nealley Corp.*, 34 *N. J. Super.* 156, 166 (App. Div. 1955); *Dolan v. Heller Bros. Co.*, 30 *N. J. Super.* 440, 444 (Ch. Div. 1954); *Scoville v. Surface Transit, Inc.*, 39 *Misc.* 2d 991, 242 *N. Y. S.* 2d 319 (Sup. Ct. 1963); Annotation, Rights and liabilities as between employer and employee with respect to general pension or retirement plan, 42 *A. L. R.* 2d 461, 467–470 (1955); Note, Legal Problems of Private Pension Plans, 70 *Harv. L. Rev.* 490, 494–495 (1957).

■ Boonton argues, however, that even if Stopford acquired a vested right to the pension, the nature of the vesting must be determined by the pension plan. So, the company says that since the plan provides that it may be terminated "at any time," its action in doing so supersedes the vesting and eliminates any obligation to continue to pay the pension benefits. The question then is, as this Court said in *Russell, supra,* "whether the employee should suffer a forfeiture of something he has earned." And we noted that "forfeiture being disfavored, we should take any tenable view of the indenture to avoid it." 50 *N. J.* at 35. A contract should not be read to make the employer's plan a mere ephemeron and the promise to pay a pension upon performance of the fixed terms a mere illusion. *Id.* at 38. A contrary view would not only violate equitable considerations,

but it would conflict with legislative policy. For example, although *N. J. S. A.* 14A:8–4 recognizes that a corporate employer's pension plan may be amended or terminated unless otherwise provided therein, it says also that "no such amendment or termination shall impair any rights which have accrued under the plan or deprive any employee * * * of the equivalent in cash or other benefits of the contributions of the employee under the plan."

■ As we have already noted, the present pension agreement required Stopford to contribute 4% of his annual compensation above $4800 to the fund during his membership in the plan. Further it established a mandate that "[t]he Company shall bear the remaining cost of the Plan" and "shall contribute to the Trustee such amounts at such times as shall be decided by the Company." This reciprocal obligation of Boonton could not be escaped simply by ignoring it. It is no answer to say that the quoted language conferred the discretionary right to make no contribution at all. Construed as it must be in favor of the employees, *Russell v. Princeton Laboratories, Inc., supra,* 50 *N. J.* at 35, the language signifies an absolute burden to bear the necessary cost of the pensions above the employees' contributions, the company's discretion relating only to the times of contribution and whether the sum required to meet the funding needs should be paid in one lump sum or in installments.

■ The Appellate Division approved defendants' contention that Boonton had the right to terminate the plan at will without liability for further pension payments to Stopford. We cannot agree.

■ Stopford, having satisfied all of the conditions precedent, acquired a vested right to the agreed lifetime pension of $296.17 monthly. *Ulmann v. Sunset-McKee Co.,* 221 *F.* 2d 128 (9 Cir. 1955); *Chinn v. China National Aviation Corp.,* 138 *Cal App.* 2d 98, 291 *P.* 2d 91 (Dist. Ct. App. 1955); *Sessions v. Southern California Edison Co.,* 47 *Cal. App.* 2d 611, 118 *P.* 2d 935 (Dist. Ct. App. 1941); *Grant*

*v. Long*, 33 *Cal. App.* 2d 725, 92 *P.* 2d 940 (Dist. Ct. App. 1939); *David v. Veitscher Magnesitwerke Actien Gesellschaft*, 348 *Pa.* 335, 35 *A.* 2d 346 (1944); Annotation, *supra*, 42 *A. L. R.* 2d 461, 468–470; *Note, supra*, 70 *Harv. L. Rev.* at 493–494. Boonton had the obligation to fund the plan with reasonable promptness. There is no suggestion that if it had done so there would not now be ample sums therein to pay the agreed pension. Even assuming the company had the right to terminate the pension plan, the termination could not operate retroactively so as to cut off previously accrued funding obligations. See *Sessions v. Southern California Edison Co., supra*, 118 *P.* 2d at 937, 939; *E. Patterson, Legal Protection of Private Pension Expectations*, 46–48, 54–55 (1960).

The Appellate Division barred Stopford's recovery because of the clause in the pension plan authorizing termination at any time. It deemed that right of the company to be dispositive and, by way of emphasis, pointed out that Stopford, as president of the company, was instrumental in having the clause incorporated in the plan. However, the termination clause cannot be considered in isolation. As set forth above, upon termination the accumulated trust fund must be distributed for the benefit of the employee-participants. If the company had performed its contractual obligation to provide the necessary funding — and, we repeat, there is no proof that if this had been done the sum so accumulated would not now be adequate to meet plaintiff's pension — the termination clause would not justify a forfeiture of Stopford's pension benefits; rather it would provide a guarantee of their payment, at least to the extent of the sum then required to be in the fund. On a fair reading of the plan, it cannot be said reasonably that the right to terminate was intended to include the right to cancel previously accrued funding obligations. Nor is there any indication that Stopford was aware of any such right. Under the circumstances, we hold as a matter of law that Boon-

ton breached its agreement with the plaintiff and remains liable to him for the payment of his pension.

## II

### LIABILITY OF KOZA AND MECOM

■ Plaintiff's claim against Koza and Mecom was predicated upon the theory that they had individually agreed to pay him the $296.17 monthly pension or that both of them, or Mecom alone, had guaranteed Boonton's agreement to do so. We find no factual basis for such a claim and agree with defendants that the trial court erred in submitting it to the jury for consideration.

■ Koza was designated as general manager of Boonton with full authority to operate the business. The designation came from Mecom who, as chairman of the executive committee of the company's board of directors, was authorized to act for it and who owned all of its stock except for a few qualifying shares held by others. There can be no reasonable doubt from the record that the relationship between Koza and Boonton was that of principal and agent. Nor can it be doubted that the activities at the plant with which we are concerned here were those of an agent for a disclosed principal — Boonton. There is no reasonable support in the record for the proposition that when Koza made the pension arrangement with Stopford, he was acting for himself or for Mecom; his principal was Boonton. Of course, an agent may make himself individually responsible by engaging expressly to perform his principal's obligation or by pledging his own credit for payment of an express undertaking. But if a contact is made with a known agent within the scope of his authority for a known or disclosed principal, the agent cannot be held liable thereon. 3 *Am. Jur.* 2d *Agency* §§ 293, 294 (1962). Clearly, Koza was running the company as its agent plenipotentiary — the extensive authority coming from Mecom, the owner of the company and the person who

had power to act for its board of directors. Stopford knew Koza was in control of the company under proper authority, and we see in his testimony nothing to indicate that Koza did anything more than agree that Boonton would pay him a lifetime early retirement benefit in acordance with the terms of the company's pension plan.

Under the circumstances it was error to submit the issue of Koza's and Mecom's liability for payment of the plaintiff's pension to the jury for decision. Consequently the judgment against them must be reversed and the case remanded for entry of judgment in their favor.

## III

## DAMAGES

■ When defendant-company terminated the pension plan and advised plaintiff that he would receive no further retirement benefits, its action amounted to a renunciation — a total anticipatory breach of its agreement to pay plaintiff $296.17 monthly during his lifetime. When that occurred, plaintiff had a choice of remedies. He could elect to sue for the accumulated unpaid benefits from October 1, 1966 to the date of trial and for a judgment of specific performance of the obligation to pay the benefits until his death. Or he could treat the breach as total and seek recovery of one lump sum representing the present value of the monetary benefits he could have received over his expectancy. See *Minnesota Amusement Company v. Larkin,* 299 *F.* 2d 142, 153 (8 Cir. 1962); *Sessions v. Southern California Edison Co., supra,* 118 *P.* 2d 935; *Conner v. Phoenix Steel Corp.,* 249 *A.* 2d 866 (Del. Sup. Ct. 1969); *Parker v. Russell,* 133 *Mass.* 74 (1882); *Pollack v. Pollack,* 39 *S. W.* 2d 853 (Tex Com. App. 1931).

*Parker v. Russell, supra,* decided by the Supreme Judicial Court of Massachusetts in 1882 is a leading case on the subject and has been cited with approval many times in the

succeeding years. There, defendant for a valuable consideration agreed to support plaintiff for life. Defendant did so for over five years and then refused to perform any longer. Plaintiff sued for damages for breach of the whole contract. Such recovery was affirmed, the court saying:

> But if the breach has been such that the plaintiff has the right to treat the contract as absolutely and finally broken by the defendant, and he elects so to treat it, the damages are assessed as of a total breach of the entire contract. * * *
>
> Such damages are not special or prospective damages, but are the damages naturally resulting from a total breach of the contract, and are suffered when the contract is broken, and are assessed as of that time. From the nature of the contract they include damages for not performing the contract in the future as well as in the past. The value of the contract to the plaintiff at the time it is broken may be somewhat indifinite because the duration of the life of the plaintiff is uncertain, but uncertainty in the duration of a life has not, since the adoption of life tables, been regarded as a reason why full relief in damages should not be afforded for failure to perform a contract which by its terms was to continue for life.
>
> When defendant for example, absolutely refuses to perform such a contract after the time for entering upon the performance has begun, it would be a great hardship to compel the plaintiff to be ready at all times during his life to be supported by the defendant, if the defendant should at any time change his mind; and to hold that he must resort to successive actions from time to time to obtain his damages piecemeal, or else leave them to be recovered as an entirety by his personal representatives after his death. 133 *Mass.* at 75–76.

Employing that quotation from *Parker v. Russell*, the United States Supreme Court approved and followed the doctrine in a case analogous to the present one. See *Pierce v. Tennessee Coal, I. & R. Co.*, 173 *U. S.* 1, 19 *S. Ct.* 335, 43 *L. Ed.* 591 (1898) ; also in accord, see *Pollack v. Pollack*, *supra*.

The principle has been applied also in fixed term employment contract cases where the employee has been subjected to a total anticipatory breach. *Moore v. Illinois Central R. Co.*, 136 *F.* 2d 412 (5 Cir.), *cert. den.* 320 *U. S.* 771, 64 *S. Ct.* 84, 88 *L. Ed.* 461 (1943) ; *Granow v. Adler*, 24 *Ariz.* 53, 206 *P.* 590 (1922) ; *Cutter v. Gillette*, 163 *Mass.*

95, 39 *N. E.* 1010 (1895); *Dixie Glass Co. v. Pollak,* 341 *S. W.* 2d 530 (Tex. Ct. Civ. App. 1960), aff'd 162 *Tex.* 440, 347 *S. W.* 2d 596 (Sup. Ct. 1961); *Greenwall Theatrical Circuit Co. v. Markowitz,* 97 *Tex.* 479, 79 *S. W.* 1069 (1904); Annotation, Recovery of damages by employee wrongfully discharged before expiration of time period filed in employment contract as embracing entire term of contract or as limited to those damages sustained up to time of trial, 91 *A. L. R.* 2d 682 (1963). In employment contract actions, however, unlike breach of lifetime pension agreement cases, the employee's recovery is usually subject to mitigation depending upon the likelihood of receipt of compensation from other employment during the unexpired term of the breached contract. *Moore v. Central Foundry Co.,* 68 *N. J. L.* 14 (Sup. Ct. 1902); see generally Annotation, *supra,* 91 *A. L. R.* 2d at 684. But such considerations, which in the past have led to some conflict in the authorities as to the measure of recovery in employment cases where the suit was brought before the end of the agreed term, have no particular pertinency in retirement or pension cases. As the United States Court of Appeals for the Eighth Circuit commented in that regard:

The theory of recovery under all of the cases involving breach of employment contracts is that the damages should be reduced by the amount the plaintiff earns or reasonably could be expected to earn during the unexpired period of the contract. A like possibility of reduction in the amount of damages may be applicable to disability contracts where future disability has not been ascertained. The Minnesota rule of McMullen & Rishmiller requires a plaintiff to await the due dates. It can then be ascertained what the plaintiff earned or should have earned in a case involving an employment contract, and whether or not the plaintiff was actually disabled under a disability contract. Other courts, however, have allowed full recovery upon breach. * * * It must be conceded that the cases dealing with employment contracts have no applicability here. There is no possibility of the amount of recovery fluctuating in accordance with plaintiff's possible earnings, even if he had any. By the contract plaintiff was 'retired' and under the agreement he was to be paid $75 weekly as long as he lived. * * * The trial court determined that because of defendant's breach of the contract, plaintiff was

entitled to anticipate the payments and not be required to await due dates. * * * We accordingly find no error in the trial court's awarding of damages based upon installment payments in the future. *Minnesota Amusement Co. v. Larkin, supra,* 299 *F.* 2d at 153.

In the present case, Stopford elected to treat defendants' action as a total breach of his lifetime pension contract and to seek lump sum damages representing his loss over the period of his expectancy. That position is sound and the trial court's acceptance of it as the basis for recovery must be sustained. Furthermore, we regard the rule submitted by plaintiff for the admeasurement of his recovery as properly applicable. The cost of an annuity designed to produce $296.17 monthly over his expectancy according to the standard mortality tables is a fair and reasonable representation of his loss. *Minnesota Amusement Company v. Larkin, supra,* 299 *F.* 2d at 153.

As we have noted above, defendant's position on the subject of damages was that another measure of calculation was properly open for consideration. Its thesis was that the present value of a dollar at plaintiff's age, as shown in the mortality tables, should be considered by the jury in its computation; that dollar value should then be multiplied by the annual pension, and the product would fairly represent plaintiff's loss. The trial court, acceding to defendants' request to charge, submitted that test to the jury also. In our judgment, its action in that respect was also proper.

Unfortunately the trial judge, in his charge to the jury, without request from either party, injected a third test for calculating plaintiff's future loss due to the termination of the pension. He instructed the jury that it could use plaintiff's life expectancy of 14.69 years as revealed by the mortality tables and apply it as a multiplier to the annual pension of $3554.04. Defense counsel correctly objected to the instruction on the ground that such a product would be excessive since it would represent gross loss and not the present value of such loss. However, on the basis of the jury verdict that error was not prejudicial.

Plaintiff's proof as to the cost of an annuity to substitute for the lifetime pension was $46,404.51; also that the cost of an annuity to provide monthly payments of $296.17 from October 1, 1966, the date of termination of the pension plan through December 1968, when the judgment would be entered, was $8399.29. Defendant offered no proof to dispute these amounts. Their total is $54,803.80, exclusive of the alleged income tax liability of $12,984.

These figures may be compared with defendants' projected basis for admeasurement of damage for future pension loss. It was to multiply $9.9658, the present value of a dollar at plaintiff's age, by the annual pension of $3554.04, which defendants calculated and the trial court accepted for its charge to the jury, as $35,192.83. The total of that sum added to $8399.29, the loss to date of judgment, but excluding the alleged income tax liability, is $43,592.12.

Finally the third measure of damages introduced by the court in its charge must be considered. That test would mean the multiplication of $3554.04, the annual pension, by 14.69 years, the plaintiff's expectancy. The product exclusive of the alleged income tax liability but plus the accrued liability at the time of judgment, would be $52,208.85 plus $8399.29 or $60,608.14.

If the claimed income tax liability is considered in connection with each of the three sums, it becomes clear beyond possible doubt that the jury accepted the measure of recovery advocated by plaintiff and his calculation based thereon in arriving at its verdict: $8399.29 + $46,404.51 + $12,984, the tax liability = $67,787.80. The verdict of $68,000, indisputably represents acceptance of those figures. In no reasonable way could the sums produced by either of the other damage theories be related to the verdict. This is particularly true with respect to the improper formula injected by the trial court. Thus, it cannot be said that the erroneous inclusion of that theory in the charge constituted prejudicial error.

## IV
## THE INCOME TAX ALLOWANCE

As the cases already cited demonstrate, when defendant-company committed an anticipatory breach of its pension agreement, plaintiff had an election of remedies. He had the right to specific performance which would have produced $296.17 monthly or $3554.04 annually. That sum would be subject to federal income tax. In the alternative, he had the right to recover a single sum representing the present value of his total pension benefits over the period of his expectancy. We accept, without deciding its legal soundness, the tax expert's view that the resulting lump sum award would be taxable income in the year of receipt. In the latter case the immediate tax would be $12,984. In the former the sum of the taxes on the annual pension income of $3554.04 over the period of plaintiff's expectancy was said to be approximately $1800 less. This was based on the speculative assumption that over that period plaintiff's taxable income status and the tax rates would remain the same.

There is no case in our State dealing with the taxability of a damage award for breach of contract. Likewise, although there are decisions in many of our sister states as to the tax consequences of judgments in either personal injury actions for injuries, pain and suffering, medical and hospital expenses and consequent past and future earning losses, or in wrongful death actions, the question has not been presented here. In those cases the majority rule is that such awards are not taxable. Annotation, Propriety of taking income tax into consideration in fixing damages in personal injury or death actions, 63 *A. L. R.* 2d 1393 (1959); for a discussion of the various reasons for non-taxability, see Friendly, J. in *McWeeney v. New York, N. H. & H. R. R. Co.*, 282 *F.* 2d 34 (2 Cir.), *cert. den.* 364 *U. S.* 870, 81 *S. Ct.* 115, 5 *L. Ed.* 2d 93 (1960) and *Petition of Marina Mercante Nicaraguense, S. A.* 364 *F.* 2d 118 (2

Cir. 1966), *cert. den.* 385 *U. S.* 1005, 87 *S. Ct.* 710, 17 *L. Ed.* 2d 544 (1967), reh. den. 386 *U. S.* 929, 87 *S. Ct.* 851, 17 *L. Ed.* 2d 803 (1967); *Hall v. Chicago & North Western Railway Co.,* 5 *Ill.* 2d 135, 125 *N. E.* 2d 77 (1955); *Dixie Feed & Seed Co. v. Byrd,* 52 *Tenn. App.* 619, 376 *S. W.* 2d 745 (1963), appeal dismissed (as to *Dixie Feed & Seed Co.*) 379 *U. S.* 15, 85 *S. Ct.* 147, 13 *L. Ed.* 2d 84, *cert. den.* (as to *Dixie Portland Flour Mills, Inc.*) 379 *U. S.* 878, 85 *S. Ct.* 143, 13 *L. Ed.* 2d 86 (1964).

In connection with the tax consequences of damages awarded for breach of contract, a further *A. L. R.* Annotation notes:

> The dearth of reported American cases on the subject suggests that income tax has seldom been a factor in actions for breach of contract. About the most that can be said in a general way, from such cases as have been found, is that they indicate that income tax consequences ordinarily have been considered not appropriate for consideration in fixing damages for breach of contract. Annotation, Propriety of taking income tax into consideration in fixing damages for breach of contract, 63 *A. L. R.* 2d 1433, 1434 (1959).

The most significant pertinent case to which we have been referred is *McLaughlin v. Union-Leader Corporation,* 100 *N. H.* 367, 127 *A.* 2d 269 (1956), *cert. den.* 353 *U. S.* 909, 77 *S. Ct.* 663, 1 *L. Ed.* 2d 663, reh. den. 353 *U. S.* 943, 77 *S. Ct.* 810, 1 *L. Ed.* 2d 764 (1967). Involved there was a suit seeking damages for an anticipatory breach of a five year employment contract. In holding that it is improper to include an additional sum to cover income tax liability, the New Hampshire Supreme Court said:

> The important question whether income taxes may be considered in assessing damages for breach of a contract of employment has never been decided in this jurisdiction. It has long been established that the test to determine whether any loss resulting from such a breach is recoverable is to inquire whether it is a loss which "the parties must have had in mind when the contract was made, or such as they either knew or ought to have known would probably result from a failure to comply with its terms." * * * We do not know of any

authority nor has able counsel brought any to our attention which held that at the time this agreement was made in November 1947 or which has since held that there may be recovery on account of increased liability for income taxes arising out of a breach of contract for services. It seems fair to say that such liability is not a "loss" within the meaning of the term as used in the assessment of damages in contract actions. 127 *A.* 2d at 272–273.

For a case reaching a contrary result involving overseas employment rendering the earnings non-taxable because of peculiar circumstances, see *Beggs v. Dougherty Overseas, Inc.,* 287 *F.* 2d 80 (2 Cir. 1961).

In view of the paucity of authority on the question, we do not find it necessary to attempt to lay down a rule of general application for all breach of contract cases. Here the plaintiff was presented with a clear choice of alternative remedies, *i. e., s*pecific performance which would produce periodic pension payments or the lump sum recovery which he chose to pursue. Assuming his expert testimony is correct, both methods would result in income tax liability, the specific performance remedy, however, producing a somewhat lower total obligation over his expectancy. Having made the choice in our view he should be obliged to abide by its tax consequences.

Under the circumstances the portion of the judgment representing the tax liability must be stricken therefrom, *i. e.,* the sum of $12,984.

## V

We agree with defendant Boonton that certain errors relating to aspects of the burden of proof were committed by the trial court in its charge. However, the only issue on this appeal is whether the defendant had the right to terminate the pension plan without further liability to the plaintiff. That issue is strictly a legal one, not involving or requiring resolution of any factual questions. Since we have concluded that the termination was an illegal breach of the agreement to pay plaintiff a pension, and also since we have imposed liability on Boonton as a matter of law, the errors

in the charge cannot be said to be so prejudicial as to require reversal of the judgment and a new trial.

## VI

The judgment for the plaintiff against Boonton as rendered in the trial court is reduced from $68,000 to $55,016 and, as modified, is affirmed. The judgments against Koza and Mecom in the trial court are reversed. The judgment of the Appellate Division is modified accordingly and the matter is remanded to the trial court for entry of the appropriate judgment.

*For modification*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANE-MAN—7.

*Opposed*—None.