132 N.J. Super. 348 (1975)
333 A.2d 572
JAMES THOMPSON AND MELVIN EVANS, ET AL., REPRESENTING THE RETIRED WORKERS OF SHEET METAL WORKERS LOCAL UNION #13, PLAINTIFFS,
v.
SHEET METAL WORKERS LOCAL UNION #13, THE PENSION FUND OF SHEET METAL WORKERS UNION #13, AND THE TRUSTEES OF THE PENSION FUND, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided January 30, 1975.
*350 Mr. Paul J. Giblin for plaintiffs.
Mr. David Friedland for defendants (Messrs. Friedland & Friedland, attorneys).
GELMAN, J.S.C.
This matter is before the court on defendants' motion for summary judgment. Plaintiffs are retired members of defendant Sheet Metal Workers Local Union #13 (union), who are currently receiving benefits from a Pension Fund (Fund) created in 1953 as a result of a collective bargaining agreement entered into between the union and an employers' association. The Fund is administered pursuant to an agreement and declaration of trust (the agreement) which provides that the employers are to make contributions to the Fund on behalf of their employees. The Fund is governed by an equal number of union and employer trustees according to rules and regulations formulated by them.
Article III of the agreement states that the pension fund created thereby is "for the exclusive benefit of the employees and their dependents" and outlines the trustees' duties and powers as including:
* * * the formulation and establishment of provisions re: eligibility, qualifications for payment of benefits, the retirement age and the amount and computation of benefits, the method of providing pensions * * *
Under the 1953 collective bargaining agreement the rate of employers' contribution to the Fund was fixed at 3% of the wages paid to union members. This rate remained in effect through the end of 1972. In 1973 the union negotiated an increase in the employers' contributions from 3% to 5%. Thereafter, the trustees adopted a new schedule of retirement benefits for union members who retire after January 1, 1973. The maximum benefit payable to such retirees is $240 a month, whereas the maximum benefits payable to members who retired prior to January 1, 1973 remained at $127.50 a month. The pre-1973 retirees, on whose behalf this action *351 has been brought, were granted a temporary benefit of $20 a month to be paid for one year.
Plaintiffs commenced this action to compel the trustees to equalize the pension benefits payable to all classes of retirees and to declare the action of the trustees establishing a differential in retirement benefits to be improper. They contend that the distribution of benefits in this manner is arbitrary and capricious in that
(1) the trustees' action was contrary to past practices wherein increases in retirement benefits were granted to all eligible retirees, regardless of their date of retirement;
(2) the trustees' action was inconsistent with the purpose of the Fund to benefit all eligible retirees;
(3) the trustees had not shown any rational basis for increasing the benefits for post-1973 retirees only.
A hearing in the nature of a discovery proceeding took place in the presence of the court at which Harold W. Hauser, the Fund's consulting actuary since 1965, testified as to the past practices of the trustees with respect to increases in pension benefits. When the plan began, the maximum monthly pension was fixed at $40 a month. On March 1, 1958 the maximum monthly pension was increased to $48 for future retirees and no increase was given to those who had already retired. Two years later the benefits were increased to $62 a month for future retirees, and no increase was given to past retirees. In 1963 the pattern was repeated and future retirees received $66 a month, while those already retired received no increase.
In August 1965 all retirees received an increase in benefits. Members retiring after that date were granted pensions at the maximum rate of $100 a month, while those who had already retired received an increase up to 78% of the new rate, or a maximum of $78. For those who had retired prior to 1958 and were thus receiving $40 a month, it meant an increase of $38; those who had retired after 1963 received an increase of only $12 a month.
*352 Prior to 1965 John Hancock Life Insurance Co. was the Fund's investment adviser, and the contributions to the Fund were used to purchase insurance policies from which the benefits were paid to the retirees. In 1965 Chase Manhattan Bank was substituted as the investment adviser, and the Fund became self-insured. Thereafter, benefits for future retirees and increases in benefits for past retirees were paid from contributions and investment income, as well as from policies purchased prior to 1965.
This new investment policy yielded, in 1969, an increase for future pensioners up to a maximum $127.50, and for those already retired a 25% increase of that portion of their pension which came directly from the Fund itself. For example, X, who retired in 1966 at $100 a month, now received $125. Mr. Y, who retired in 1954 with a pension of $40 a month and who received a $38 increase from the Fund in 1965, received an additional increase of 25% of $38, or $9.50, for a total of $87.50 a month.
From the foregoing recital of the history of benefit payments by this Fund it is apparent that benefit levels were never equalized by the trustees as a matter of policy or practice but were determined by the date of retirement and the resources available to the Fund.
The principal issue raised by plaintiffs is the nature and extent of the duty owed by the union trustees to those members of their union who have now retired and are beneficiaries of the Fund. It is said that the union trustees owed them a duty to raise their pension benefits out of the increased contributions to the Fund resulting from the 1973 collective bargaining agreement. Before examining this contention it is necessary to explore briefly the nature of union pension plans and the manner in which they are financed.
Most pension funds such as that involved here were instituted after World War II. As is customary at the beginning of the operation of such a pension fund, many retirees received pension "credit" for their work prior to the time that contributions were actually made to the fund in order to make *353 them eligible for benefits when they reached the age of retirement. The cost of retirement benefits, which are based on the employee's years of service before the inception of the pension plan, is known as the "prior service cost."
Under the Metal Workers' pension plan ten years' service credit is required to make a union member eligible to receive a pension at age 65, and 30 years' service is required for the maximum benefit allowance. Since the Fund is only a little more than 20 years old, it has a large unfunded prior service cost. Future employer contributions must be large enough to fund the benefits payable to future retirees, plus enough to amortize the unfunded prior service costs[1].
At the last evaluation of the Fund on January 1, 1973 the assets of the Fund were $2,441,535 and the liabilities $4,776,480[2]. The Fund had an unfunded prior service cost of $2,334,945, some portion of which is attributable to the retired employees who are the plaintiffs here. Nevertheless, plaintiffs have received and will continue to receive benefits at a level which is actuarily in excess of the contributions made on their behalf while they were actively employed. Current contributions being made on behalf of active union members have been and are now being used to pay those benefits. The Fund must continue to receive these contributions in order to pay the present level of benefits to plaintiffs.
Pension plans such as Local #13's are established under § 302(c) (5) of the Taft-Hartley Act. They must be maintained as separate trusts whose funds cannot be used for any purpose other than the payment of pensions or annuities. 29 U.S.C. § 186(c) (5). They are also subject to regulation by the Internal Revenue Service, which requires that whenever *354 plan benefits change, IRS approval must be obtained (Revenue Ruling 70-257). To comply with the IRS requirements, actuarial calculation must verify that the benefits have been set at a level such that the assets and liabilities of the fund are in balance.
In theory this balance could have been maintained if the trustees had allocated the increase in employer contributions under the 1973 agreement to raise and to equalize benefits for all participants, both active members and retirees. Hauser testified that had this course been followed, the 2% increase would have yielded a uniform benefit level of approximately $175 a month. Once the trustees made the choice to allot the increase in employer contributions to fund greater benefits for post-1973 retirees, the 2% increase made possible a benefit level of $240 a month for that group.
At the time of the negotiations which led to the 1973 agreement the active union members were also considering alternative pension schemes, such as a retirement savings plan or participation in the International Union's pension fund, neither of which would have yielded an increase in benefits for the retirees. In their decision to allocate increased pension benefits only to active members the trustees were influenced by the possible loss of future contributions required to support present levels of vested pension benefits. Employer contributions at an increased level were essential to the liquidity of the Fund, and without a prospective substantial increase in benefit levels for active members they would not approve a collective bargaining contract which took current dollars from their pockets to increase benefits for retirees.
It is true that the union trustees play a dual role. The union trustees are also the business agents and officers of the union and in the latter capacity serve as the collective bargaining representatives of the active union membership. As bargaining agents they are accountable to the active members, whose interest lies in their own current and future financial welfare rather than in that of the retirees. Agreements *355 hammered out at the bargaining table when they serve as bargaining agents provide the funds for the pension plan, and these same trustees must then administer the Fund for the benefit of all participants, both the active union members and the retirees. As the Supreme Court noted in Allied Chemical & Alkali Workers v. Pittsburgh Plate Glass Co., 404 U.S. 157, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971):
* * * the union's role in the administration of the fund is a far different order from its duties as collective-bargaining agent. [at 170, 92 S.Ct. at 373]
Both the federal case law and the law of our own State establish that the standard of care by which the union trustees' conduct must be judged in this setting is that of a fiduciary administering a trust.[3] There is nothing in any federal labor statutes or in their history which can be said to alleviate the otherwise strict common-law fiduciary responsibilities of trustees appointed to administer employee welfare or pension funds developed as a result of collective bargaining. The legislation enacted by Congress was designed not to alter but to reinforce "the most fundamental duty" owed by the trustee: the duty of undivided loyalty to the beneficiaries. 2 Scott on Trusts (3d ed. 1967), § 170. This is the duty to which defendant trustees must be held. Blankeship v. Boyle, 329 F. Supp. 1089, 1094-1095 (D.C. 1971); Lee v. Nesbitt, 453 F.2d 1309 (9 Cir.1972); Roark v. Lewis, 130 U.S. App. D.C. 360, 401 F. 2d 425 (D.C. Cir.1968), adhered to sub nom. Roark v. Boyle, 141 U.S. App. D.C. 390, 439 F.2d 497 (D.C. Cir.1970). See also, Welch and *356 Wilson, "Application of Trust Law to Representatives in Taft-Hartley Trust Funds," 28 Arbitration Journal 81 (1973).
In Judge v. Kortenhaus, 79 N.J. Super. 574 (Ch. Div. 1963), members of one local of the teamsters union invoked the court's equity power to adjudicate their rights under a pension fund established in accordance with a similar Agreement and declaration of trust. There, as here, the trustees were given broad powers to administer the trust. After acknowledging the inherent jurisdiction of equity to supervise the management of trusts, the court described the interest of each member of the fund as being that of a beneficiary of the trust, albeit an equitable one only. Each newly vested participant is possessed of an interest in the fund which is equal to that of the oldest participant. To this extent the principle exemplifies the spirit of trade unionism as expressed in Del Veccio v. Hood, 4 N.J. Super. 254 (App. Div. 1949) which declared that,
* * * A union works for the benefit of the group; * * * who are members at any time, an ever changing group. The man who ceases to be a member, loses all title to the assets of the union and loses all benefits of membership while the member elected today comes into all the benefits and advantages that others have won in years gone by. [at 258]
When an eligible member retires from his employment and ceases to be an active member of the union, his vested rights in the Fund cannot be diminished or destroyed. Cantor v. Berkshire Life Ins. Co., 171 Ohio St. 405, 171 N.E.2d 518 (Ohio Sup. Ct. 1960); Stopford v. Boonton Molding Co., 56 N.J. 169, 185 (1970). By the same token, such pension rights as are vested at the date of retirement constitute the full measure of any member's entitlement. In the absence of any specific provision either in a collective bargaining agreement or the trust agreement itself creating a right to an increase in benefits, those members of Local #13 who retired prior to January 1, 1973 are entitled to receive *357 only those benefits which had previously vested in them and no more.
Given the economic structure of this Fund and the choices available to the trustees, it cannot be said that they had a duty to equalize plaintiffs' pension benefits with those of the active membership, or that the choice they made was either arbitrary or capricious.
With respect to defendant union, clearly it had no duty to bargain with the employers' association on behalf of the retired members of the union. In Allied Chemical & Alkali Workers v. Pittsburgh Plate Glass Co., supra, the court was called upon to decide whether "employee" as used in § 9(a) of the Taft-Hartley Act[4] included retirees for purposes of membership in a collective bargaining unit. The union was engaged in negotiations with an employer over an employee health insurance plan in which retired employees participated. Reasoning that a collective bargaining unit must advocate the needs of its membership, the court held that active and retired employees, while having a common concern in assuring that later benefits remain adequate, did not "share a community of interests broad enough to justify inclusion of the retirees in the bargaining unit." In fact, the court observed:
* * * the risk cannot be overlooked that union representatives on occasion might see fit to bargain for improved wages or other conditions favoring active employees at the expense of retirees' benefits. [404 U.S. at 173, 92 S.Ct. at 394.]
Even if, as in the case before us, having once found it advantageous to bargain for improvements in retired pensioners' benefits, the representatives of the active workers were *358 not thereafter bound or obliged to negotiate on behalf of the retirees. Id., 404 U.S. at 181, 92 S.Ct. 383. There is, as defendants correctly argue, no duty on the part of the union to represent the interest of retired members when negotiating with employers or other third parties.
For the foregoing reasons defendant's motion for summary judgment is granted.
NOTES
[1] The unfunded prior service costs of this Fund also derive from increases in benefits granted by the Trustees during the years the Fund has been in existence.
[2] The liabilities are made up of the present value of future benefits for those employees already retired plus those who will retire in the future.
[3] Although not applicable to the instant case, the recently enacted Pension Reform Act of 1974, (P.L. 93-406, 1974, 29 U.S.C. § 1001 et seq.), leaves little doubt that administrators and trustees of the plan are fiduciaries. The act defines "fiduciary" in broad terms, including those named and those who can exercise control over the funds. See §§ 402(a), 405(d) (2), 412. Penalties for a breach of fiduciary duty are severe and include personal liability for making good any loss to the fund. See §§ 409, 411.
[4] "Representatives designated ... shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment." 49 Stat. 453, as amended, 29 U.S.C. § 159(a).