Bruno MICHOTA, et al., Plaintiffs,

v.

ANHEUSER–BUSCH, INC., et al., Defendants.

Gustav A. ADAMS, et al., Plaintiffs,

v.

TRUSTEES OF the N. J. BREWERY EMPLOYEES' PENSION TRUST FUND, et al., Defendants.

Civ. A. Nos. 77–2543, 76–1931.

United States District Court, D. New Jersey.

Sept. 19, 1980.

Hellring, Lindeman, Goldstein & Siegal by Richard K. Coplon, Newark, N. J., for Michota et al.

McMenaman & Grasso by Ronald E. Hoffman, Spring Lake Heights, N. J., for Adams et al.

Stephen D. Schreiber, Washington, D. C., for Pension Benefit Guaranty Corp.

Kapp & Finkel by Herman W. Kapp, Newark, N. J., for defendant Rheingold Breweries.

Stryker, Tams & Dill by John J. Rizzo, Newark, N. J., for defendant Pabst Brewing Co.

Carpenter, Bennett & Morrissey by Edward F. Ryan, Rosemary A. Hall, Newark, N. J., for defendant Anheuser-Busch, Inc.

Orloff, Lowenbach, Stifelman & Siegel by Jeffrey M. Garrod, Newark, N. J., for defendant Falstaff Brewing Corp.

MEANOR, District Judge.

This complex litigation concerns the pensions of certain former employees of the P. Ballantine & Sons (Ballantine) brewery formerly located in Newark, New Jersey.

In 1956, Ballantine, along with several other employers, entered into an Agreement and Declaration of Trust with the Brewery Workers Joint Local Executive Board of New Jersey (Teamsters Locals 843 and 153, hereinafter the Union) and the New Jersey Brewers Association. The Agreement was denominated "New Jersey Brewery Employees Pension Trust Fund" (hereinafter Trust Fund). Among the other participating employers were Anheuser-Busch, Inc. (Budweiser), Pabst Brewing Co. (Pabst) and Liebmann Breweries, Inc. (Rheingold). The Trust Fund was jointly administered under § 302(c)(5) of the Labor-Management Relations Act of 1947 (LMRA), 29 U.S.C. § 186(c)(5). In June 1956, the trustees of the Trust Fund established a pension plan (hereinafter Brewery Plan) effective August 1, 1955.

## I

To lend context to the facts leading to the institution of this lawsuit, some explication of the salient provisions of the Trust Fund and Brewery Plan is necessary.

Article V, § 5.1 of the Trust Fund required "[e]ach Employer ... [to] pay ... the Trustees the Employer contributions required ... by the current and effective [CBA]." Article VI, § 6.1(a) provided that "[a]n Employer shall cease to be an Employer under this Agreement whenever ... his obligation to make contributions to the Trust Fund is no longer required by a [CBA]." When this eventuality occurred, Article VI, § 6.2(a) provided

The Employees of such Employer who have not begun to receive a pension un-

der the Pension Plan shall cease being Employees for the purpose of this Trust and their rights and benefits shall be determined in accordance with the Pension Plan as it applies to Employees whose service has terminated; provided that if any Employees of such Employer enter service with another Employer and have contributions made on their behalf within such a period that their service is not considered broken or lost for the purpose of the Pension Plan, such Employees shall remain Employees under the Trust.

Additionally, upon withdrawal an employer had, with certain irrelevant exceptions, "no further ... obligations ... under this Trust Agreement." Article VI, § 6.2(b).

Article VIII, § 8.2(a) provided

No Employee nor any person claiming by or through such Employee shall have any right, title or interest in or to the funds or other property of the Trust Fund ... except as specifically provided herein and in the Pension Plan.

Article VIII, § 8.3 provided, in pertinent part,

Neither this Trust nor the Pension Plan imposes any obligation on any Employer to make any payments to the Fund; any such obligations are, as to Employers, derived solely from whatever provisions there may be in the Collective Bargaining Agreement from time to time ....

Finally, Article VIII, § 8.4 provided, in pertinent part,

No dispute or question arising under this Trust or the Pension Plan shall be subject to the grievance or arbitration procedure provided for in the Collective Bargaining Agreement. All such disputes or questions ... shall be resolved by the Trustees in the manner herein provided.[1]

Ballantine's Newark brewery terminated operations effective April 1, 1972. As of

---

1. The Trust Fund was not amended with respect to any of these sections through May 31, 1973. That date marked the expiration of the last CBA obligating Pabst and Budweiser to make contributions to the Trust Fund. Afft. of William F. Griffin, ¶¶ 3–5 (Feb. 16, 1978).

that date,[2] the Brewery Plan contained the following relevant provisions.

Article I, § 14 of the Brewery Plan defined "Credited Service" as "the years of an Employee's past service and future service credit." Past service referred to the years an employee had worked prior to his employer becoming a contributor to the Trust Fund. Article I, § 14(b). Future service referred to credit received by an employee for employment from the time his employer was obligated to contribute. Article I, § 14(a). As in the Trust Fund, the term "Employer" in the Brewery Plan referred to an employer obligated to contribute to the Trust Fund by the terms of a CBA. Article I, § 9. An "Employee" meant "an employee on behalf of whom contributions shall be required" by virtue of a CBA. Article I, § 11.

Pursuant to Article I, § 14(c), an employee lost his credited service if the employee "ceas[ed] to be employed by an Employer . . . and [did] not become re-employed by such Employer or employed by another Employer within . . . one year following . . . cessation of employment, except as provided in Article X." Section 2 of Article X provided that "[n]otwithstanding the provisions of [§ 14(c)] . . . an Employee whose employment is terminated shall be eligible for a pension [at] age 65 provided that at the time his employment is terminated he has completed . . . the number of years of Credited Service for future service" determined by reference to a table set forth in the Brewery Plan. That table provided that, for plan years 1965 and later, 10 years of credited service for future service was necessary for an employee to come within Article X, § 2. This section was apparently derived from a proviso contained in earlier versions of Article I, § 14(c) which stated that the forfeiture provisions did not "apply as to loss of Credited Service if an Employ-

ee has completed at least 10 years of Credited Service for future service [when] he ceases to be employed by an Employer."

Eligibility for pension benefits was outlined in Article II. As provided in the Brewery Plan, an employee was eligible when he had "completed at least ten (10) years of Credited Service and attained age 65," had "completed at least thirty (30) years of Credited Service" or reached the compulsory retirement age of 67. Furthermore, Article II, § 2 provided for an early retirement option for an employee who had reached age 60 and had obtained between 15 and 30 years of credited service. That section included "a terminated Employee . . . entitled to a deferred pension as provided in Article X." See also Article X, § 3 (prescribing procedural requirements for employees "eligible for a pension as provided in Section 2 of . . . Article X").

The pivotal section of the Brewery Plan—Article VII—was inserted in the following form by an amendment in May 1970. Deposition of Horst Poeschla at 132; Exhibit 2 annexed to Afft. of William F. Griffin (Feb. 16, 1978). Prior to that time, withdrawal of an employer did not operate to divest an employee of those benefits "vested" by application of Article X, § 2.[3] As inserted in May 1970, Article VII provided

Section 1. *Notwithstanding any other provision of the Plan to the contrary if an Employer ceases to be an Employer . . . all of the Credited Service of its then employees (including its former employees who terminated employment with such Employer within the three month period immediately preceding the date on which such Employer ceased to be an Employer) shall be cancelled except for the Credited Service of the following employees of the ceased Employer: (a) those Employees who have completed*

---

2. A copy of the Brewery Plan, as amended to April 1, 1972, is attached as Exhibit 2 to the Afft. of William F. Griffin (Feb. 16, 1978). Mr. Griffin was, at that time, industrial relations manager of Pabst's Newark brewery.

3. That is the case since the prior version of Article VII treated employees of a withdrawn employer "as though their employment had ceased" as of the date of withdrawal. Thus, the provisions of Article I, § 14(c) and Article X, § 2 were triggered by withdrawal of an employer from the Trust Fund.

thirty (30) years or more of Credited Service; (b) those Employees who have both completed at least ten years (10) of Credited Service and attained age 65; (c) those Employees who have both completed at least fifteen (15) years of Credited Service and attained age 60; (d) those Employees who have completed at least ten (10) years of Credited Service with one or more of the Employers who is remaining as an Employer under the Plan; and (e) *those Employees who are placed on the regular employees seniority list of a remaining Employer and accumulate enough Covered Days with such remaining Employer during the one year period commencing on and immediately following the date their Employer ceased to be an Employer to earn at least one-fifth (⅕) of a year of Credited Service, excluding for the purpose of this determination all Covered Days with their Employer who ceased to be an Employer and assuming, for the purpose of this determination, that the Covered Days with a remaining single Employer all were earned during one Plan Year.*

The term employees as used in this Section 1 shall mean persons covered by the current Collective Bargaining Agreements between the Employers and the Unions.

Section 2. If an Employer ceases to be an Employer as defined herein, the Trustees shall instruct the actuary for the Plan to conduct a valuation of the Plan as of the date such Employer ceased to be an Employer, taking into consideration the total funds available and the actuarial liabilities for benefits accrued by all Employees based on the Credited Service in effect after the cancellation of Credited Service as defined in Section 1 of this Article VII. Based upon the results of this valuation, the monthly retirement pension payable in accordance with the provisions of Article II, Article III, Article IX and Article X shall be reduced for all eligible Employees who make application for pension on or after the date such

Employer ceased to be an Employer and for all Employees who made application for retirement within the three month period immediately preceding the date on which such Employer ceased to be an Employer. The reduction in the monthly retirement pension payable referred to in the preceding sentence shall apply uniformly to all Credited Service in effect after the cancellation of Credited Service as defined in Section 1 of this Article VII. This reduction in monthly retirement pensions shall be determined by the actuary of the Plan in such a manner that the rate at which the unfunded accrued liability was being funded according to the actuarial valuation on the July 31 preceding the date such Employer ceased to be an Employer shall be estimated to continue to be the rate at which the unfunded accrued liability is being funded on the day after such Employer ceased to be an Employer.

(Emphasis added.)

Subsequently, on September 22, 1972 (several months after Ballantine had closed), Article VII, § 1(e) was amended. Rather than saving service credit by virtue of covered days "on the regular seniority list of a remaining employer," this subsection was amended to permit accumulation of sufficient time "employed by another single Employer under" the Brewery Plan. At oral argument, counsel for the Pension Benefit Guaranty Corporation (PBGC) asserted that the 1972 amendment had an ameliorative effect in that the requirement that an employee be a regular employee on the seniority list was eliminated and mere employment would count toward the requirements of Article VII, § 1(e). In both instances the PBGC contended that an employee was required to accumulate the time with a single employer rather than with the other industry employers as a group. (Tr. 6/23/80 at 5–6). The extent to which these amendments were publicized to the employees is a matter in dispute between the parties.[4] I note also that Article X, § 2 was

---

**4.** Other noteworthy provisions of the Brewery Plan include Article V, § 1, providing that "de-

cisions of the Trustees in administering the

not eliminated or amended upon adoption of the revised Article VII.

## II

As noted previously, Ballantine ceased operations as of April 1, 1972. It is beyond dispute that the Ballantine closing effected a major dislocation in the brewery industry in New Jersey. The loss of Ballantine contributions certainly had an impact on the solvency of the Brewery Plan. On May 31, 1973, the CBAs obligating Pabst and Budweiser to contribute to the Trust Fund expired. Pabst and Budweiser withdrew from the Trust Fund and, pursuant to the 1973–1976 CBAs, established individual plans for their own employees. Falstaff Brewing Corp. (Falstaff), which had purchased certain assets of Ballantine, was obligated by its CBA to follow the lead of Pabst and, after arbitration, established a plan for its own employees. Rheingold, the last employer contributing to the Trust Fund, ceased operations at its Orange, New Jersey brewery in late 1977. At that time, Rheingold ceased making contributions to the Trust Fund. In June 1978, the Brewery Plan was terminated, effective December 31, 1977 pursuant to ERISA § 4048(1), 29 U.S.C. § 1348(1). The PBGC was appointed successor trustee of the Brewery Plan pursuant to § 4042(c) of ERISA, 29 U.S.C. § 1342(c).[5]

After the Ballantine closing, many of its former employees left the beer industry. Some obtained work with Falstaff, which required a large temporary work force to move inventory from Newark to its North Bergen, New Jersey distribution center. Falstaff did not have a CBA with the Unions, but agreed to follow the Ballantine CBA for a limited period. When this temporary agreement expired, Falstaff took the position that no CBA was in effect. By November 1972, the movement of inventory, etc., was complete and over 100 men were laid-off by Falstaff.

During the period of the employment of these individuals, Falstaff contributed pension monies into an escrow fund rather than into the Trust Fund. As noted above, Falstaff established its own plan pursuant to its 1973–1976 CBA. The contributions that had been paid into escrow were deposited in the Falstaff plan pursuant to an arbitration award. After negotiations with the Unions, a "supplemental list" was created whereby the 100 plus laid-off men were to be offered jobs prior to Falstaff hiring other personnel. Falstaff also agreed that, when rehired, these men would retain seniority for purposes of fringe benefits. Thereafter, in early December 1974, Falstaff offered employment to the men on the "supplemental list." Few accepted. Since Falstaff was not obligated by a CBA to make contributions to the Trust Fund, the employment with Falstaff was not considered covered employment. Thus, pursuant to Article VII, § 1 the credited service of the former Ballantine employees that had been temporarily employed by Falstaff was forfeited. The circumstances surrounding Falstaff's employment of these individuals were litigated before me previously in *Balback v. Teamsters Local 153, et al.*, Civ. No. 1604–73. As detailed *infra*, Falstaff contends that the findings of fact and conclusions of law in *Balback* are determinative with respect to its asserted liability.

Other former Ballantine employees obtained employment by "shaping up" at

Plan shall be final," Article V, § 2, stating that "[n]o Employee ... shall have any right, title or interest in or to the funds or other property of the Trust Fund ... or the Plan except as such ... has been granted in accordance with the terms of the Trust Agreement and the Plan," and Article VI, § 2 providing, in pertinent part, "no person shall have any claim for benefits against the Union, any Employer, or the Trustees." Finally, the Brewery Plan was a non-contributory plan, *i. e.*, funded exclusively

through employer contributions. Article VI, § 1.

5. The PBGC ascertained "that it is unable to determine that the assets of the [Brewery] Plan" were sufficient to discharge all "nonforfeitable" benefits when allocated in accordance with ERISA. Agreement for Appt. of Trustee and Termination of Plan, ¶ 7 (Pl. Exhibit 1). See ERISA §§ 4001(a)(6), 4022, 4041(c), 4044, 29 U.S.C. §§ 1301(a)(6), 1322, 1341(c), 1344.

the union hall, *i. e.*, appearing at the union hall and reporting to whichever brewery needed help on a given day. *E. g.*, Afft. of Bruno Michota, ¶ 16 (Mar. 14, 1978). Pursuant to the CBAs in effect at that time, regular employees had "reciprocal" rights, *i. e.*, had the right to assume a spot at the bottom of the regular seniority roster in another brewery upon being laid-off by their original employer. The newly-formed Budweiser and Pabst plans recognized the industry service of their employees for purposes of benefits under the respective plans. However, the Budweiser Plan required that an employee be on its regular seniority list as of June 1, 1973 in order to gain credit for benefit purposes for past service in the Brewery Plan. Budweiser Pension Plan, Article I, §§ 6, 13. Budweiser did not place the former Ballantine employees on its seniority roster, taking the position that no reciprocity was required since regular employment was not available. Deposition of Horst Poeschla at 160–165. In October 1973, an amendment to the CBA between Budweiser and the union was adopted which required an "unattached regular" to work 225 days prior to being placed on the Budweiser seniority list.

Thus, with respect to most former Ballantine employees the service earned in the Brewery Plan was not credited for benefit purposes in the Budweiser Plan. As with the individuals that worked for Falstaff, the past service of many Ballantine employees was forfeited pursuant to Article VII, § 1.

The facts with respect to Pabst and Rheingold are much more sketchy. There is some allegation made that Pabst, like Budweiser, "froze" its seniority roster. No specific allegations are made with respect to the conduct of Rheingold. As set forth below, none of the named plaintiffs were ever regularly employed by Pabst or Rheingold. All of the named plaintiffs eventually secured full-time employment with Budweiser prior to June 1, 1973.

III

The complaint in this action was filed on December 12, 1977.[6] The named plaintiffs (hereinafter "Michota" plaintiffs) included 18 former Ballantine employees that had been employed by Falstaff between April and November 1972 and subsequently obtained employment by Budweiser. These individuals were denominated in the complaint as "Ballantine-Falstaff-Budweiser" plaintiffs. Complaint ¶ 4. Additionally, one widow of a former "Ballantine-Falstaff-Budweiser" employee was named as a plaintiff. Complaint ¶ 6. The "Michota" plaintiffs also include 10 individuals, denominated "Ballantine-Budweiser" plaintiffs who secured full-time employment with Budweiser after the Ballantine closing. Complaint ¶ 5.[7]

Named as defendants were Budweiser, Pabst, Falstaff, Rheingold, Ballantine, Investors Funding Corp. (the former owner of Ballantine), the Trust Fund, the PBGC and the individual trustees of the Trust Fund.[8]

The complaint asserted that the action "arises under" §§ 301 and 302 of the LMRA, 29 U.S.C. §§ 185, 186, §§ 10 and 27 of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j, 78aa and Rule 10(b)5 promulgated thereunder, the Declaratory Judgment Act, 28 U.S.C. § 2201, the Employee

**6.** An earlier action had been filed on October 7, 1976 entitled *Adams v. New Jersey Brewery Employees Pension Trust Fund*, Civ. No. 76–1931. The *Adams* case was consolidated with the present action for all purposes by order of April 25, 1979.

**7.** Frederick Hubner, one of the "Ballantine-Budweiser" plaintiffs died January 27, 1978 shortly after the filing of the complaint.

**8.** On December 5, 1979, an order was entered on the motion of the individual trustees for dismissal of the complaint as to them. The order dismissed the complaint without prejudice as to the individual trustees. The dismissal is to be converted into a dismissal with prejudice in the event no action seeking to impose individual liability on the trustees is brought within 60 days after final definition of the plaintiff class certified in the fifth count.

On May 5, 1980, an order was entered dismissing Investors Funding Corp. from the action. It appeared that that entity had never been served.

Retirement Income Security Act of 1974, §§ 502, 4002 and 4003, 29 U.S.C. §§ 1132, 1302, 1303 and "common law principles." Complaint ¶ 1. Jurisdiction is alleged under § 4003 of ERISA, § 27 of the Securities Exchange Act of 1934 and 28 U.S.C. §§ 1331, 1337, as well as "the principles of pendent jurisdiction." Complaint ¶ 2.

The substantive allegations of the complaint are somewhat vague and conclusory. For the sake of brevity, I summarize the allegations contained therein and the various theories of liability asserted against the defendants. The overriding theme of the first, second and fourth counts is the imposition of direct liability on one or more of the defendants for the funding of lifetime pension benefits for the "Michota" plaintiffs.

The complaint clearly states that the "Michota" plaintiffs were not eligible, as of April 1, 1972, to commence receiving pension benefits. However, each "Michota" plaintiff had between 12 and 28 years of service as of that date and benefits were allegedly "vested" as of that date. Complaint ¶¶ 24–26. As to Pabst, Rheingold and Budweiser, the following theories are discernible in the first and fourth counts: (1) By virtue of their status as former contributors to the Trust Fund, Pabst, Budweiser and Rheingold are obligated to fund pension benefits for the "Michota" plaintiffs; (2) Pabst, Budweiser and Rheingold promised to fund pension benefits for the "Michota" plaintiffs, which promises were relied upon to plaintiffs' detriment and, therefore, the employers should be estopped from denying liability for the pensions of the "Michota" plaintiffs; (3) Pabst, Budweiser and Rheingold failed to disclose the manner in which credited service might be forfeited, thereby working a fraud upon the "Michota" plaintiffs, and (4) Pabst, Budweiser and Rheingold are derivatively liable for alleged breach of fiduciary duty by the trustees in the adoption and application of the break-in-service rule of Article VII, § 1 to the "Michota" plaintiffs.

An additional theory of liability against Budweiser is discernible in the first, second and fourth counts. See Complaint ¶¶ 23, 30–36, 38–41, 50. In essence, the "Michota" plaintiffs claim that Budweiser's refusal to place them on Budweiser's regular seniority list as of June 1, 1973 was a violation of the applicable CBAs. The result was that Ballantine service was not credited for the Budweiser Plan and forfeited for purposes of the Brewery Plan.

The allegations with respect to Falstaff are contained in the first count and paragraphs 51–53 of the fourth count. In essence, the "Michota" plaintiffs claim that Falstaff had an obligation to assume Ballantine's obligations to the Trust Fund. Falstaff wrongfully failed to fulfill these obligations by paying pension contributions into escrow rather than to the Trust Fund. The result was that the Ballantine service of the "Michota" plaintiffs was forfeited under the Brewery Plan. Falstaff is also charged with the failure to disclose the manner in which credited service could be forfeited, thereby working a fraud upon the "Michota" plaintiffs.

The "Michota" plaintiffs sought funding of lifetime pensions under the Brewery Plan with full credit for all industry service or, alternatively, lifetime pensions under the Budweiser Plan, again with full credit for all service in the industry.

The complaint was amended in April 1979 to add a fifth count. A class of plaintiffs was certified with reference to the relief sought therein. That class was tentatively defined as the group of "all former employees of Ballantine with at least ten years of service under the . . . Trust Fund as of May 25, 1970 or April 1, 1972 . . . who are not presently receiving pensions from said Fund." It should be noted that the "Michota" plaintiffs are members of this class.

The class relies upon the previously-quoted provisions of Article X of the Brewery Plan. Paragraph 69 asserts that the PBGC does not intend to pay pension benefits to the class members upon their fulfilling the age requirements of the Brewery Plan. Paragraph 70 alleges that, although the Brewery Plan contained a loss of service provision, that section could not be given

effect after a member of the class had accumulated 10 years of credited service for future service. On this basis, the class plaintiffs contend they are entitled to a pension from the Brewery Plan and Trust Fund and the PBGC is obligated to pay these benefits.

Finally, an amended answer was filed on behalf of the PBGC in April 1980. Cross-claims were asserted against Budweiser, Pabst and Rheingold based upon the provisions in ERISA imposing liability upon an employer, within defined limits, for unfunded plan liabilities paid by the PBGC. See ERISA §§ 4062–4064, 29 U.S.C. §§ 1362–1364. At the same time, a third-party claim was filed against Chock Full O'Nuts, the parent corporation of Rheingold. Budweiser, Pabst, Rheingold and Chock Full O'Nuts in turn filed crossclaims against the PBGC. The legal efficacy of the various crossclaims and third-party claims is not currently before the court. It is my understanding that, regardless of the result of the various claims asserted by the individual and class plaintiffs, the PBGC will press its cross-claims and third-party claims. That is the case since the guaranteed benefits of the Brewery Plan exceed its assets regardless of the claims of the individual and class plaintiffs. The success or failure of plaintiffs affects only the size of the deficit.[9]

Presently before the court are the following applications: (1) a motion by the PBGC for summary judgment with respect to the fifth count; (2) a cross-motion for summary judgment by the class plaintiffs with respect to the fifth count; (3) a motion for summary judgment by Pabst; (4) a motion for summary judgment by Budweiser; (5) a motion for summary judgment by Falstaff; (6) a motion for summary judgment by Rheingold.[10]

## IV

I begin with the cross-motions of the PBGC and the plaintiff class regarding the fifth count. The motion of the PBGC is premised upon jurisdictional grounds. The PBGC argues that this court lacks jurisdiction over the fifth count by virtue of § 514 of ERISA, 29 U.S.C. § 1144.[11] The limitation to claims arising prior to January 1, 1975 is said to carve out an exception to the general grant of jurisdiction in § 502 of ERISA, 29 U.S.C. § 1132. The underlying factual premise is, of course, that the claims of the plaintiff class arose prior to January 1, 1975.

Pursuant to ERISA § 4022(a), 29 U.S.C. § 1322(a), the PBGC is required to guarantee payment of pension benefits which are "nonforfeitable" under the terms of a plan subject to ERISA at the time of its termination. It is undisputed, at least for purposes of this motion, that the Brewery Plan was subject to ERISA upon its termination effective December 31, 1977. The PBGC construes the term "nonforfeitable" in the following manner:

> a benefit payable with respect to a participant is considered to be nonforfeitable, if on the date of termination of the plan the

**9.** The third count of the complaint against the trustees of the Trust Fund and the PBGC is largely moot. As recited above, the Brewery Plan was terminated effective December 31, 1977 and the PBGC appointed successor trustee. The extent to which the benefits of the named plaintiffs are "nonforfeitable" and, therefore, guaranteed by the PBGC is a matter subsumed within the class relief sought in the fifth count.

**10.** Rheingold makes no independent argument on behalf of its motion, relying upon the arguments advanced by the other brewery defendants.

**11.** ERISA § 514(a), 29 U.S.C. § 1144(a) provides

> (a) Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title. This section shall take effect on January 1, 1975.

Section 514(b)(1) of ERISA, 29 U.S.C. § 1144(b)(1) provides

> This section shall not apply with respect to any cause of action which arose, or any act or omission which occurred, before January 1, 1975.

participant (or beneficiary) has satisfied all of the conditions required of him under the provisions of the plan to establish entitlement to the benefit, except the submission of a formal application, retirement, [or] completion of a required waiting period.

29 C.F.R. § 2605.6(a).[12]

▮ Section 302 of the LMRA generally prohibits payments by employers to unions. An exception to that proscription is provided in § 302(c)(5) of the act, 29 U.S.C. § 186(c)(5), allowing contributions "paid to a trust fund established . . . for the sole and exclusive benefit of the employees of such employer, and their families and dependents." Section 302(c), 29 U.S.C. § 186(c), confers jurisdiction upon district courts "to restrain violation of" this provision. Under § 302(e) a district court has jurisdiction "to enforce a trust fund's compliance with . . . subsection (c)(5) by eliminating those offensive features in the structure or operation of the trust that would cause it to fail to qualify for a (c)(5) exception." *Associated Contractors v. Laborers Int'l. Union*, 559 F.2d 222, 225 (3d Cir. 1977). Section 302(e) does not confer general supervisory power over the actions of the trustees in a jointly-administered plan.

*Knauss v. Gorman*, 583 F.2d 82 (3d Cir. 1978). However, there is no question that an eligibility provision in a pension plan covered by § 302 which is arbitrary and capricious as applied to one or more plan beneficiaries constitutes a "structural defect." *Id.* at 86–87. There is no question that § 302 remains applicable to jointly-administered pension plans post-ERISA. Section 514(d) of ERISA, 29 U.S.C. § 1144(d), so provides.[13] Finally, there is no question that, but for application of Article VII, § 1 the deferred pension benefits of the plaintiff class would be "nonforfeitable" as that term is defined by the PBGC. The PBGC so conceded at oral argument. (Tr. 6/23/80 at 4).

▮ Thus, even if the PBGC is correct in its assertion that § 514(b)(1) precludes a substantive cause of action under ERISA, this court has jurisdiction to determine the legality of Article VII, § 1 under § 302 of the LMRA.[14] If Article VII, § 1 is unenforceable as to the class plaintiffs by virtue of § 302, the pension benefits due the class plaintiffs are "nonforfeitable" and are, thereby, within the benefits guaranteed by the PBGC under § 4022 of ERISA, 29 U.S.C. § 1322.[15]

---

**12.** The only definition of "nonforfeitable" in ERISA itself is set forth in § 3(19) of the statute, 29 U.S.C. § 1002(19):

The term "nonforfeitable" when used with respect to a pension benefit or right means a claim obtained by a participant or his beneficiary to that part of an immediate or deferred benefit under a pension plan which arises from the participant's service, which is unconditional, and which is legally enforceable against the plan.

In *Nachman Corp. v. Pension Benefit Guaranty Corp.*, 446 U.S. 359, 370–75, 100 S.Ct. 1723, 1730–32, 64 L.Ed.2d 354, 364–66 (1980), the Supreme Court construed this statutory definition in accordance with the regulatory definition devised by the PBGC. Although § 3(19) is not directly applicable to the termination insurance provisions of Title IV of ERISA, 446 U.S. at 370 & n. 14, 100 S.Ct. at 1731 & n.14, 64 L.Ed.2d at 364 & n. 14, the Supreme Court focused on whether the claim to benefits from the plan itself was legally enforceable, rather than on the employer's liability under the plan for contributions beyond the plan assets at termination. *Id.* at 370–73, 100 S.Ct. at 1730–32, 64 L.Ed.2d at 364–65.

**13.** Section 514(d), 29 U.S.C. § 1144(d), provides, in pertinent part,

Nothing in this subchapter shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States . . . or any rule or regulation issued under any such law.

**14.** This conclusion is clearly mandated by the *Knauss* case. The District Court in *Knauss* had held that application of § 514(b)(1) of ERISA precluded a claim under that statute. *Knauss v. Gorman*, 433 F.Supp. 1040 (W.D.Pa.1977). That determination was not challenged on appeal. 583 F.2d at 84 n. 4. Nevertheless, the Court of Appeals quite unequivocally evaluated, under § 302, the "break-in-service" provision at issue in that case. *Id.* at 85–91.

**15.** In a recent submission to the court, Budweiser argues that the benefits of the plaintiff class were not "vested" nor "nonforfeitable" until actual retirement under conditions of eligibility. That is the case since the trustees were always empowered to amend the Plan. Article VIII, § 1. As I understand it, Budweiser

■ I have examined the allegations of the complaint with particular scrutiny given the fifth count. The complaint is by no means crystal clear. In paragraph 1, the "Michota" plaintiffs assert that the claim "arises under" § 302. The fifth count does not refer to the alleged invalidity of Article VII, § 1 under § 302. The pleading relies particularly upon Article X, § 2 and asserts that "[a]lthough the Plan provided . . . participants could lose credited service if their employment terminated" such was not the case after 10 years of service had been credited. The complaint also refers to the fact that the PBGC and Trust Fund did not intend to pay benefits to the members of the plaintiff class. Complaint ¶¶ 66–70. It is undeniable that this refusal is premised upon Article VII, § 1. It is also undeniable that Article X, § 2 cannot apply unless Article VII, § 1 is invalid as applied to individuals with sufficient service to come

within that section. Thus, while reliance upon § 302 could well have been pleaded with greater clarity and specificity, I believe that the issue of the validity of Article VII, § 1 under § 302 is raised in the complaint. Even if my conclusion were to the contrary, I would allow an amendment to make that reliance more explicit. Accordingly, the motion of the PBGC for summary judgment will be denied.[16]

I have previously explicated the salient provisions of the Brewery Plan. Pursuant to Article X, § 2 an employee with 10 years of credited service for future service was eligible for a pension upon reaching the requisite age. Article X, § 2 superseded Article I, § 14(c) which otherwise operated to divest an employee of service credit once the employee had been terminated. Thus, prior to 1970 a terminated employee was eligible to receive a pension, upon reaching the requisite age, based upon his credited

---

does not contend that any amendment other than Article VII, § 1 divested the plaintiff class of pension benefits. Rather, the mere reservation of the power to amend renders benefits not "nonforfeitable" until retirement. Budweiser relies upon the following cases for the above proposition: *Boase v. Lee Tire & Rubber Corp.*, 437 F.2d 527 (3d Cir. 1970); *International U. of United Brewery, Flour, Cereal, Soft Drink & Distillery Wkrs. of Amer. v. Duke & Co., Inc.*, 373 F.Supp. 778 (W.D.Pa.1974), aff'd, 510 F.2d 969 (3d Cir. 1975); *Bosi v. USM Corp.*, 90 LRRM 2867, 2875 (D.N.J.1975).

However, in *Nachman Corp. v. Pension Benefit Guaranty Corp.*, 446 U.S. 359, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980), the Supreme Court held that a provision in a plan limiting benefits to those that could be provided by the assets of the plan on termination and, accordingly, limiting the employer's liability did not, in itself, render benefits not "nonforfeitable." In light of this ruling, the applicability of the cases cited by Budweiser is questionable, especially since none of those cases concerned interpretation of the termination insurance provisions contained in Title IV of ERISA. I believe it is quite clear from *Nachman* that an employer's direct liability under a plan and its derivative liability under Title IV of ERISA are not coextensive. Thus, *Boase, Duke* and *Bosi* are inapposite to this portion of the motion, at least insofar as those cases concern themselves with direct employer liability under a plan as opposed to the statutory guarantee of benefits by the PBGC under ERISA.

In short, applying *Nachman, supra,* I do not believe that the mere reservation of the power to amend by the trustees rendered the benefits

of the plaintiff class outside of the ambit of the term "nonforfeitable." *See also, Rochester Corp. v. Rochester,* 450 F.2d 118, 120 (4th Cir. 1971).

16. Plaintiffs also rely upon § 4003 of ERISA, 29 U.S.C. § 1303, as a jurisdictional predicate. In particular, subsection (f) of § 4003 confers jurisdiction over an action by a participant or beneficiary "adversely affected by any action of the" PBGC. ERISA § 4003(f), 29 U.S.C. § 1303(f). The PBGC has clearly indicated that, in its capacity as successor trustee, it intends to acquiesce in the action of the prior trustees in applying Article VII, § 1 to the plaintiff class. It is undisputed that the PBGC does not presently intend to pay benefits to the plaintiff class on this basis. It is clear that the PBGC regards the adoption of Article VII, § 1 as a permissible exercise of the trustees' discretion. It is also clear that the PBGC does not regard the benefits of the plaintiff class as "nonforfeitable." Finally, the PBGC became trustee in June 1978. Thus, the exclusion of § 514(b)(1), 29 U.S.C. § 1144(b)(1) for actions under § 4003(f) accruing prior to January 1, 1975 is inapplicable. *See Cowan v. Keystone Employees Profit Sharing Fund,* 449 F.Supp. 235, 237 & n. 3 (D.Mass.) (dictum), aff'd, 586 F.2d 888 (1st Cir. 1978).

I believe the above actions and positions taken by the PBGC satisfy the requirements of § 4003(f). Therefore, I conclude that § 4003(f) is available to the plaintiff class as an alternative jurisdictional basis.

service prior to termination if that employee had sufficient "credited service for future service" under Article X, § 2.

Article VII changed this result in circumstances in which a contributing employer withdrew from the Trust Fund. Article X, § 2 was not eliminated from the Brewery Plan. Thus, while divestiture occurred after a "break-in-service" occasioned by withdrawal of a contributing employer, a "voluntary" termination, e. g., an employee quitting his job more than 90 days prior to his employer's withdrawal, did not result in forfeiture of service credit. Thus, an employee with 10 years of credited service for future service who quit at Ballantine more than 90 days prior to its closing remained eligible for a pension with credit for his service up to the date of his termination. Those who remained at Ballantine until its closing had their service credit forfeited upon failure to comply with the added service requirement of Article VII, § 1(e).

The plaintiff class has moved for summary judgment, asserting that Article VII, § 1 is arbitrary and capricious as applied to the class members and is, therefore, unenforceable under § 302.

■ I agree with the PBGC in its assertion that a "break-in-service" rule does not in itself constitute a "structural defect" under § 302. *See, e. g., Lee v. Nesbitt,* 453 F.2d 1309, 1311 (9th Cir. 1972). As pointed out earlier, the trustees of the § 302 trust have wide discretion over the day-to-day administration of the fund. *Knauss v. Gorman,* 583 F.2d at 86. Nevertheless, as stated in *Knauss,* "where a . . . requirement capriciously excludes employees from benefits, it is not the prudence of the plan's administration . . . at issue, but the fairness of its basic structure." *Id.*

The *Knauss* case illustrates the factors to be considered in determining whether a "break-in-service" provision, such as Article VII, § 1 passes muster under § 302. In *Knauss,* plaintiff had worked for a meatpacking plant from 1936 until 1962 when his employer went bankrupt. He had been covered by a pension plan in effect since 1957. As with the present case, the plan gave

service credit for both past and future service. When his employer terminated operations, plaintiff sought employment with other covered employers through his union. Having failed to find such employment, Knauss moved from Pittsburgh to the West Coast. Returning four years later, Knauss obtained employment with another contributing employer from 1966 until his lay-off in 1972. *Id.* at 83–84.

The plan in which Knauss had been a participant had merged into a national plan in 1970. The national plan had a "break-in-service" provision which operated to forfeit service credits earned prior to a break of more than two years of covered service. Under this provision, the administrators of the national plan determined that Knauss' 26 years of service prior to 1962 would not be counted toward pension eligibility. *Id.* at 84.

The Court found that the provision gave "rise to apparently arbitrary distinctions." *Id.* at 88. Among the factors the Court relied upon in reaching this conclusion were (1) prior to the break-in-service Knauss had accumulated sufficient service to entitle him to a pension upon reaching the required age; (2) the "break-in-service" was not voluntary but rather resulted from unavailability of covered employment; and (3) the apparently irrational exceptions provided in the plan. *Id.* at 88–89. The Court commented that "[a] prerequisite that divests the employee on whose account contributions were made because of an involuntary break in service, and that distributes those contributions to other employees, seems to be at odds with the Congressional intent in enacting the 'sole and exclusive benefit' requirement." *Id.* at 89. The Court held that "where a break-in-service provision deprives an otherwise eligible employee of all benefits derived from substantial contributions made in his behalf, § 302(c)(5) requires . . . substantial justification for the stipulation in terms of the Fund's legitimate goals." *Id.*

In *Knauss,* the trustees of the plan had suggested that the actuarial viability of the plan would be endangered by invalidation

of the "break-in-service" provisions. *Id.* at 91. The *Knauss* Court commented that it was "most reluctant to order ... any decree that would threaten" the fund's solvency since "the purposes of § 302 would be ill-served by sacrificing the security of the Plan's other beneficiaries." *Id.* at 91. Accordingly, the Court remanded the case for an evidentiary hearing concerning "the actuarial necessity of the break-in-service" provision. *Id.*[17]

The plaintiff class in the present case is in much the same position as the plaintiff in *Knauss.* By definition, the plaintiff class members had accumulated sufficient service under Article X, § 2 to receive a pension, based upon service up to the time of termination, upon reaching the requisite age. Application of Article VII, § 1 certainly operates to divest the members of the plaintiff class of significant service credit. For example, of the 29 "Michota" plaintiffs, 27 had accumulated between 20 and 28 years of credited service by April 1, 1972. Exhibit B annexed to Supp.Afft. of Bruno Michota (Mar. 31, 1978).

Furthermore, the "break-in-service" suffered by the plaintiff class was not in any sense "voluntary." The 1972 closing of Ballantine effected a major economic dislocation in the local brewery industry. There was a surfeit of brewery employees in the area. There is no evidence that employment with remaining contributing employers was adequate to absorb all or substantially all of the former Ballantine employees. On the contrary, the union itself apparently was concerned about "overloading" the Budweiser, Pabst and Rheingold rosters since such "overloading" was a fac-

tor in the demise of Ballantine. Deposition of Herbert Heilmann, Jr. at 83–88.

■ I do not regard the fact that some Ballantine employees managed to comply with Article VII, § 1(e) as particularly pertinent. That fact certainly does not make the "break-in-service" of the plaintiff class members "voluntary." In *Knauss,* there was no evidence that anyone but the single named plaintiff had been adversely affected by the "break-in-service" provision at issue. 583 F.2d at 85–87. *See also Burroughs v. Board of Trustees,* 542 F.2d 1128 (9th Cir. 1976) ("break-in-service" rule arbitrary and capricious as applied to single individual), *cert. denied,* 429 U.S. 1096, 97 S.Ct. 1113, 51 L.Ed.2d 543 (1977). Certainly, if as in *Knauss,* a provision that affects only one individual initially may be violative of § 302, the fact that some individuals may have complied with Article VII, § 1 does not render the "break-in-service" of the remaining employees "voluntary." A party seeking to attack a "break-in-service" provision is not required to demonstrate that every potentially covered individual was adversely affected. *See Knauss v. Gorman,* 583 F.2d at 87. The suggestion of the PBGC that the "break-in-service" was a matter of "chance" rather than the result of an arbitrary and capricious rule strikes me as nothing more than an exercise in semantics.

Finally, rather than evenhandedly treating "voluntary" and "involuntary" service breaks, the Brewery Plan actually treated "voluntary" termination more favorably. Under the terms of the plan, had each member of the plaintiff class quit his employment at Ballantine on December 31,

---

**17.** An analogous list of factors is contained in the recent Second Circuit decision in *Valle v. Joint Plumbing Industry Bd.,* 623 F.2d 196 (2d Cir. 1980). The Court in *Valle* commented:

In determining whether the particular application of a new eligibility requirement was arbitrary and capricious, a number of factors should be considered. They include the extent to which the applicant was an intended beneficiary of the plan, the extent to which the amendment retroactively strips the beneficiary of significant service credit, the extent to which the trustees have notified the em-

ployees of these and other changes in rules, and the extent to which there is actuarial justification for denying benefits in the particular case.

*Id.* at 203. *Accord, Argo v. Joint Plumbing Industry Bd.,* 623 F.2d 207 (2d Cir. 1980).

*See also Lee v. Nexbitt,* 453 F.2d 1309, 1311–12 (9th Cir. 1972) (break-in-service invalidated insofar as divested employee (1) whose break-in-service was "involuntary" and (2) had completed minimum service requirements prior to the service break, *i. e.* had sufficient service without having reached required age).

1971 (more than 90 days prior to Ballantine's withdrawal) no forfeiture would have occurred. By continuing in the employ of Ballantine until April 1972, those same employees were subjected to a forfeiture of all their years of service in the industry. In effect, the plaintiff class was penalized for continuing to work. *See Rochester Corp. v. Rochester*, 450 F.2d 118, 120–21 (4th Cir. 1971). The PBGC conceded that the Brewery Plan operated in precisely this fashion. (Tr. 6/23/80 at 6–9). Such a provision is diametrically opposed to one commonly stated motivation for providing such a plan, *i. e.*, the encouragement of a stable work force. *See Knauss v. Gorman*, 583 F.2d at 90.

▆▆▆ Based on the foregoing, I believe that the plaintiff class has facially established that Article VII, § 1 is arbitrary and capricious and therefore violative of the "sole and exclusive benefit" requirement of § 302. Under *Knauss*, a "substantial justification" for the rule must be established in order to preserve its validity. The PBGC asserts that Article VII, § 1 was grounded in actuarial necessity and, therefore, is valid under *Knauss*.

Article VII had its genesis in the 1967 industry CBA. Section 17.2 of that agreement provided

The parties agree that a Partial Termination Clause shall be incorporated into the New Jersey Brewery Employees Pension Trust Plan which shall determine benefits for employees of a company which ceases to be a "Participating Employer" under said Plan, in order to protect the equities of the employees of each Company remaining in the Plan and making the required contributions as stated herein.

As recited above, Article VII, § 1 was adopted in May 1970 and amended in September 1972. Between 1967 and 1970 the companies and the union had "frequent discussions . . . about the formulation of such a clause." Deposition of Horst Poeschla at 132. Mr. Poeschla, then industrial relations manager at Budweiser, testified on deposition concerning the rationale behind Article VII:

Well, all trustees recognized that if a run on the Fund occurred, there would not be sufficient funds to meet the demands. If every employee that was eligible to retire retired on one given day, the Fund would not have sufficient monies to provide for all pensions. Consequently the union as well as the companies were concerned to provide an orderly method by which the existing funds could be distributed among those employees who would be most—who would probably not be able to find employment some place else.

Deposition of Horst Poeschla at 133. The PBGC relies also on the exercise of the authority conferred by Article VII, § 2 in reducing the benefit rate as indicative of the actuarial basis of the rule. Finally, counsel for the plaintiff class conceded that Article VII was grounded in an attempt to keep the Brewery Plan actuarially sound. That it did not accomplish this goal is undisputed.

I believe the PBGC has misread the import of *Knauss*. That case did not suggest that any provision with some actuarial basis is valid under § 302. If that were the case, any "break-in-service" provision, however draconian, would survive scrutiny under § 302 since any provision reducing potential plan liabilities has a positive actuarial impact. The *Knauss* Court was clearly concerned with the *future* impact on the solvency of a fund as the result of a judgment requiring payment of benefits to one individual. 583 F.2d at 91. No such possibility exists here. In point of fact, invalidation of Article VII, § 1, as applied to the plaintiff class, will have no impact whatsoever on the Brewery Plan's solvency. It is undisputed that the liabilities of the plan exceed its assets without regard to the claims of the plaintiff class. In pursuing its cross-claim, the PBGC has admitted as much. Moreover, payments to other beneficiaries will not be in any way jeopardized by a judgment in favor of the plaintiff class since the PBGC is statutorily required to pay all "nonforfeitable" benefits.

■ I do not believe that the trustees must exhibit prescience in the exercise of their duties under § 302. However, when a provision, such as Article VII, § 1, operates to divest individuals of pensions earned during a lifetime of employment, I believe something more is required than a showing that the trustees anticipated favorable impact on the actuarial soundness of the plan to justify that rule. The "substantial justification" test of *Knauss* implies that the solvency of the plan must be threatened by invalidation of the provision. No such demonstration has been made. Additionally, as set forth below, I do not hold that Article VII, § 1 is *per se* invalid.

I express no opinion with regard to the validity of Article VII, § 1 as applied to individuals situated differently from the plaintiff class members. Specifically, I express no opinion as to whether Article VII, § 1 is valid as applied to individuals who did not have sufficient service under Article X, § 2. Nor do I express any opinion with regard to the actions of the trustees in reducing benefits under Article VII, § 2. That action has not been challenged in this litigation.

One additional argument raised by the PBGC merits attention. Both Pabst and Budweiser withdrew from the Trust Fund as of June 1, 1973 and established their own plans as of that date. Thus, pursuant to Article VII, § 1 all covered employees of both Budweiser and Pabst arguably suffered a "break-in-service" for purposes of the Brewery Plan as of May 31, 1974. Both Pabst and Budweiser, however, generally picked up the industry service of its employees for purposes of their individual plans.

Article III, § 5 of the Budweiser Plan provides that an employee's benefits under the plan are to be "reduced by the actuarial equivalent of the benefits to which such Employee is entitled under the" Brewery Plan. No such provision is contained in the Pabst plan. However, the Pabst 1979–1982 CBA includes a provision similar to the Budweiser provision. Both Pabst and Budweiser have asserted crossclaims against the PBGC. Those claims assert that, in the event of a judgment on behalf of plaintiffs against the PBGC, "PBGC will be liable . . . in an amount equal to the actuarial equivalent of benefits due under the . . . [Brewery] Plan to individuals" receiving benefits under the Pabst and Budweiser Plans. Pabst Crossclaim ¶ 9; Budweiser Crossclaim ¶ 9.[18]

In light of these crossclaims, the PBGC has raised the possibility that a judgment in favor of the plaintiff class invalidating Article VII, § 1 will result in a wholesale "dumping" of liabilities upon the PBGC which had previously been assumed by Pabst and Budweiser. The PBGC asserts that it will be required to consider the benefits of Pabst and Budweiser employees "nonforfeitable" if Article VII, § 1 is invalidated.[19]

The validity of the Pabst and Budweiser crossclaims is not currently before the court. However, since the PBGC has advanced the possibility as an argument against summary judgment in favor of the plaintiff class, I offer the following comments.

As I pointed out earlier, I do not believe that Article VII, § 1 is *per se* invalid. Thus, the assumption that a judgment in favor of the plaintiff class would result in all service credit of Pabst and Budweiser employees being regarded as "nonforfeitable" is not necessarily accurate. The situation with respect to the vast majority of Pabst and Budweiser employees, *i. e.*, those that were

---

**18.** The difference between the crossclaims is that the Pabst crossclaim is limited to individuals retiring after June 1, 1979, the effective date of the current Pabst CBA.

**19.** The Pabst and Budweiser employees covered by their respective employer's plans fall into two categories. The first consists of the vast majority of employees who were always employed by Pabst and Budweiser and had no significant connection with Ballantine. The second category consists of individuals terminated upon Ballantine's closing that were employed by Pabst and Budweiser in circumstances in which those companies recognized Ballantine service for purposes of the Pabst or Budweiser Plan.

always employed by those companies, is factually distinguishable from the situation of the plaintiff class. The obvious distinction is that those individuals have suffered no loss. A second distinction is that Pabst and Budweiser employees not previously employed by Ballantine are not members of the plaintiff class and would not be beneficiaries of a judgment in favor of that class. Additionally, a judgment in favor of the plaintiff class does not invalidate Article VII, § 1 as applied to individuals without sufficient service credit to comply with Article X, § 2. Finally, as set forth below, the invalidation of Article VII, § 1 would require, as I read the Brewery Plan, treatment of the plaintiff class members as terminated employees, which would not require recognition of post-termination service for benefit purposes. Thus, I believe the concern of the PBGC is largely ephemeral.

■ I conclude that, on the undisputed facts, the plaintiff class is entitled to summary judgment on the fifth count. I hold that, as applied to the plaintiff class, Article VII, § 1 is arbitrary and capricious and, therefore, unenforceable under § 302. That being the case, the benefits due the members of the plaintiff class are "nonforfeitable" and, hence, guaranteed by the PBGC under Title IV of ERISA.

In my estimation, the consequences of such a holding is that the plaintiff class members are entitled to be treated as terminated employees under the Brewery Plan. That is, the members of the plaintiff class are entitled to a pension from the Brewery Plan, upon satisfying the age requirement of Article II, § 1 or, if applicable,

the early retirement provisions of Article II, § 2, based upon all years of service up to April 1, 1972. Summary judgment will be entered in favor of the plaintiff class accordingly.[20]

V

■ As summarized above, the "Michota" plaintiffs have asserted a number of theories in seeking to impose liability for the claimed pension benefits directly upon Pabst, Budweiser, Rheingold and Falstaff. The first theory, asserted against Pabst, Budweiser and Rheingold, simply seeks to impose liability based upon the employers' status as former contributors to the Trust Fund. I agree with defendants that this theory is legally unsupportable.

The Trust Fund required an employer to make "contributions required . . . by the current and effective" CBA. Article V, § 5.1. An employer ceased to be an employer under the Trust Fund "whenever . . . his obligation to make contributions . . . [was] no longer required by a [CBA]." Article VI, § 6.1(a). Article VIII, § 8.3 quite unequivocally limits the employer's obligation: "[n]either this Trust nor the Pension Plan imposes any obligation . . . to make . . . payments to the Fund; any such obligations are, as to Employers, derived solely from . . . provisions . . . in the Collective Bargaining Agreement."

The Brewery Plan contained similar limitations. The term "Employer" referred to an employer obligated to make contributions by a CBA. Article I, § 9. "Employee" referred to an individual "on behalf of whom contributions shall be required" by a CBA. Article I, § 11. Article VI, § 2

---

**20.** The plaintiff class had also asserted that Article VII, § 1 should be invalidated because of the lack of notice given the beneficiaries of its adoption and substantive provisions. *Burroughs v. Board of Trustees*, 542 F.2d 1128 (9th Cir. 1976), *cert. denied*, 429 U.S. 1096, 97 S.Ct. 1113, 51 L.Ed.2d 543 (1977). *See also Valle v. Joint Plumbing Industry Bd.*, 623 F.2d 196 (2d Cir. 1980); *Carlsen v. Masters, Mates & Pilots Pension Plan Trust*, 80 N.J. 334, 403 A.2d 880 (1979). Were this the sole basis for the alleged invalidity of Article VII, § 1, I would be constrained to deny summary judgment. There is

quite clearly a genuine issue of material fact as to the manner and timing of notice of adoption of Article VII, as well as the extent of employee awareness of the provisions. *See* Deposition of Horst Poeschla at 135–136; Deposition of Herbert Heilmann, Jr. at 37–38; Afft. of Walter Lemke, ¶¶ 13–16 (Mar. 15, 1978); PBGC Supp. Memorandum, Exhibit 7. I believe, however, because of the onerous consequences engendered by application of Article VII, § 1 to the plaintiff class, resolution of this issue in favor of the PBGC would not affect the determinations made above.

provided that "no person shall have any claim for benefits against ... any Employer."

Pabst, Budweiser and Rheingold were obligated, by the terms of the various CBAs, to make defined contributions to the Trust Fund. The last CBAs imposing that obligation expired May 31, 1973. The CBA effective June 1, 1973 imposed an obligation to make contributions, not to the Trust Fund, but to the newly-established individual plans of Pabst and Budweiser. There is no indication that the 1973–1976 CBAs were not the product of arms-length collective bargaining. There is also no contention made that Pabst and Budweiser failed to meet their obligations under the prior CBAs, i. e., failed to make contributions in the required amounts.

For purposes of ascertaining the direct liability of Pabst, Budweiser and Rheingold for the pensions of the "Michota" plaintiffs, I am obligated to apply the terms of the agreements consummated between the union and employers. *United Steelworkers of America v. Crane Co.*, 605 F.2d 714, 717 (3d Cir. 1979); *International U. of United Brewery, Flour, Cereal, Soft Drink & Distillery Wrkrs. of Amer. v. Duke & Co., Inc.*, 373 F.Supp. 778, 785–86 (W.D.Pa.1974), aff'd, 510 F.2d 969 (3d Cir. 1975).[21]

The agreements are perfectly clear and unambiguous. Simply stated, Pabst, Budweiser and Rheingold were obligated to make the contributions required by an effective CBA. These employers have, apparently, fulfilled their obligations under all CBAs which required contributions to the Trust Fund. While I agree that the beneficiaries are entitled to a construction of the plan which resolves ambiguities in their fa-

vor, see, e. g., *Stopford v. Boonton Molding Co., Inc.*, 56 N.J. 169, 185, 265 A.2d 657 (1970), there is simply no ambiguity in the Trust Fund or Brewery Plan which requires such resolution.

In this regard, *Hurd v. Hutnick*, 419 F.Supp. 630 (D.N.J.1976) is, at best, distinguishable. In that case, the court held that a contract to fund lifetime pensions was formed between the contributing companies and those employees that retired while a collective bargaining agreement requiring contributions was in force. *Id.* at 653–54. Such a construction is amply supported by the cases. See *Allied Chem. & Alkali Wrkrs. Local No. 1 v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 181 n.20, 92 S.Ct. 383, 398 n.20, 30 L.Ed.2d 341 (1971) (dictum); *Hoefel v. Atlas Tack Corp.*, 581 F.2d 1, 4–5 (1st Cir. 1978), cert. denied sub nom. *Atlas Tack Corp. v. Mahoney*, 440 U.S. 913, 99 S.Ct. 1227, 59 L.Ed.2d 462 (1979); *Thompson v. Sheet Metal Wrkrs. Local U. No. 13*, 132 N.J.Super. 348, 333 A.2d 572 (Ch.Div.1975). This is to be distinguished from the situation where currently active employees seek to compel an employer to contribute to a plan after the CBA requiring such contributions has expired. *International U., etc. v. Atlas Tack Corp.*, 590 F.2d 384, 386 (1st Cir. 1979). This distinction was recognized in *Hurd*. 419 F.Supp. at 656. The "Michota" plaintiffs are, with regard to direct liability of the employer, in the latter situation. Thus, I conclude that the prior obligation of Pabst, Budweiser and Rheingold to contribute to the Trust Fund did not survive the expiration of the last CBA that required such contributions. The status of Pabst and Budweiser as former contributors does not impose any duty

21. I do not currently have before me any question relating to employer liability to the PBGC under §§ 4062–4064 of ERISA, 29 U.S.C. §§ 1362–1364. The statutory scheme of Title IV contemplates that the PBGC pay "nonforfeitable" benefits with the PBGC collecting, within certain limits, from the plan's contributing employers. Title IV does not impose any direct liability on employers for payments directly to plan beneficiaries. It is at least implicit, however, in *Nachman Corp. v. Pension Benefit Guaranty Corp.*, 446 U.S. 359, 100 S.Ct. 1723,

64 L.Ed.2d 354 (1980) that an employer may have a statutory liability to the PBGC under ERISA in circumstances in which the employer is not obligated to make further contributions by the terms of the contract. Not having had a full explication of the legal positions of the employers and the PBGC with reference to the crossclaims and third-party claim under Title IV, however, I express no opinion with regard to the legal efficacy of the PBGC's claims under these provisions.

to continue making contributions, nor can there be any direct liability to the "Michota" plaintiffs to fund their pension benefits.[22]

## VI

 The second theory upon which the "Michota" plaintiffs seek to impose liability upon Pabst, Budweiser and Rheingold is that of promissory estoppel. I agree with the defendants that this theory has no application to a jointly-administered plan subject to § 302. Section 302 is a penal statute, requiring strict construction. *Arroyo v. United States*, 359 U.S. 419, 79 S.Ct. 864, 3 L.Ed.2d 915 (1959); *Moglia v. Geoghegan*, 403 F.2d 110 (2d Cir. 1968), *cert. denied*, 394 U.S. 919, 89 S.Ct. 1193, 22 L.Ed.2d 453 (1969). The statute requires "the detailed basis on which . . . payments are to be made" to be "specified in a written agreement." LMRA § 302(c)(5)(B). 29 U.S.C. § 186(c)(5)(B). Accordingly, the "vast majority" of courts have refused to apply estoppel principles to plans subject to § 302. *Reiherzer v. Shannon*, 581 F.2d 1266, 1267 n.1 (7th Cir. 1978) and cases cited therein. Application of estoppel principles would "seriously undermine the 'written agreement requirement' of" the statute. *Id.* (citing *Thurber v. Western Conf. of Teamsters' Pension Plan*, 542 F.2d 1106 (9th Cir. 1976)). *See Lewis v. Seanor Coal Co.*, 382 F.2d 437, 441–44 (3d Cir. 1967) (holding oral modification of written agreement for payment of royalties ineffective under § 302; dictum stating "there can be no estoppel against . . . assertion of the public policy" condemning such a modification), *cert. denied*, 390 U.S. 947, 88 S.Ct. 1035, 19 L.Ed.2d 1137 (1968). The only "written agreements" limited the employers' obligation to contributions in accordance with a CBA. The CBA defined the obligation in terms of specified amounts per compensable day. The dollar amount of contributions was renegotiated and changed in each succeeding CBA. Thus, to apply estoppel principles would fly in the face of the "detailed basis" and "written agreement" requirements of § 302. I believe the contrary suggestion in *Hurd v. Hutnick*, 419 F.Supp. at 656–57 is incorrect and I decline to follow it. Accordingly, summary judgment is granted in favor of the employer defendants on the direct claims of the "Michota" plaintiffs, insofar as the "Michota" plaintiffs rely upon the doctrine of promissory estoppel.[23]

## VII

 The "Michota" plaintiffs also seek to impose liability on Pabst, Budweiser, Rheingold and Falstaff on the basis that the employers breached a duty to plaintiffs by failing to disclose material facts to the "Michota" plaintiffs. Specifically, the employers are alleged to have failed to affirmatively disclose the manner in which credited service could be forfeited, thereby working a fraud upon the plaintiffs. Insofar as this claim is premised upon § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b–5 promulgated thereunder, the claim is foreclosed by *International Brotherhood of Teamsters, etc. v. Daniel*, 439 U.S. 551, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979). That case held that an interest in a noncontributory, compulsory

---

**22.** Although Rheingold continued contributing to the Trust Fund until late 1977, I have been presented with nothing which would convince me that Rheingold should be treated any differently with regard to this theory of liability. It is undisputed that none of the "Michota" plaintiffs ever were employed by Rheingold on a regular basis. The same is true of Pabst.

**23.** The recent New Jersey decision in *Carlsen v. Masters, Mates & Pilots Pension Plan Trust*, 80 N.J. 334, 403 A.2d 880 (1979) is inapposite. In *Carlsen*, the Supreme Court of New Jersey held that the trustees and union were estopped, under the circumstances, from forfeiture of the

plaintiff's pension benefits. *Id.* at 340–42, 403 A.2d 880. However, *Carlsen* does not discuss the impact of § 302. The decision does not hold that an employer whose obligations are clearly delineated in a CBA can, by virtue of estoppel, have obligations beyond those imposed by the CBA. Additionally, as pointed out in *note 20, supra* the facts concerning publication of Article VII are mixed. Finally, I do not believe that experienced union men, such as the "Michota" plaintiffs, could have reasonably relied upon alleged employer representations contradicting those clearly delineated in the CBA.

pension plan, like the Brewery Plan, was not a "security" within the meaning of § 3(a)(10) of the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(10). 439 U.S. at 570.

■ Insofar as a claim of common-law fraud or deceit is intended, I believe the claim is likewise insufficient. The Trust Fund imposed no obligations, other than the payment of contributions, on the employers. *See* Article VIII, § 8.3. The employers merely had the right to designate a trustee representative. Article III, §§ 3.1, 3.3. The employers retained no discretion in administering, applying or amending the Brewery Plan. *See* Article IV. Thus, the "Michota" plaintiffs have not demonstrated or pleaded that the employers had any duty to disclose amendments to the Brewery Plan to the employees. With respect to Falstaff, which never was a signatory to the Trust Fund, this point is crystal clear. I believe summary judgment is warranted with respect to any allegation of common-law fraud or deceit against Pabst, Budweiser, Rheingold and Falstaff.

### VIII

■ The final theory of liability in the first and fourth counts against Pabst, Budweiser and Rheingold appears to involve derivative liability for the actions of the individual trustees in adopting and applying Article VII, § 1 to the "Michota" plaintiffs. *E. g.* Complaint ¶¶ 35, 48–49. It is perfectly clear that, under the Trust Fund, discretion in administering the trust, including the power to amend, was vested in the trustees. *See* Trust Fund, Article IV. The only authority retained by the employers was the power, required under § 302, to designate an employer representative as a trustee. The employee representative, the union, retained identical power. I believe that, under the circumstances, no liability can be derivatively imposed on the employers for the actions of the trustees in adopting and applying Article VII, § 1 to the "Michota" plaintiffs. *Boyer v. J. A. Majors Co. Employees Profit Sharing Plan*, 481 F.Supp. 454, 458 (N.D.Ga.1979); *Baeten v. Van Ess*,

474 F.Supp. 1324, 1330–31 (E.D.Wis.1979); *Barrett v. Thorofare Mkts., Inc.*, 452 F.Supp. 880, 884 (W.D.Pa.1978); *Young v. Cudahy Packing Co.*, 57 LRRM 2455 (N.D. Ga.1964). *See Dudo v. Schaffer*, 82 F.R.D. 695, 700–02 (E.D.Pa.1979).

### IX

The circumstances surrounding Budweiser's employment of the "Michota" plaintiffs have been summarized previously. Both the industry and Budweiser CBAs for 1970–1973 provided "reciprocal rights," *i. e.* "the right to be employed as a regular employee of the lowest seniority" in another plant upon termination at another brewery. *See, e. g.*, 1970–1973 Budweiser CBA, Article IV, § 4.1–4 (App. of Anheuser-Busch, Inc., Exhibit 1 at 14). It is apparently undisputed that each of the "Michota" plaintiffs became employed by Budweiser prior to June 1, 1973. Budweiser declined to place the "Michota" plaintiffs on the regular employees seniority list. Although Budweiser's action is somewhat unclear, it appears that Budweiser took the position that the former Ballantine employees were "unattached regular employee[s]" under Article IV, § 4.2–3 of the 1970–1973 Budweiser CBA, *i. e.* regulars not on the seniority list of Budweiser or another local brewery. Such an "unattached regular employee" had the "right to be placed on the regular employees seniority list ... provided that a job is available ... in which he formerly had seniority." 1970–1973 Budweiser CBA, Article IV, § 4.2–3. Budweiser took the position, under this section, that no job was available, interpreting "job" as "continuous employment" as opposed to "day-to-day" work. Deposition of Horst Poeschla at 157–164. Additionally, since no work was available for Budweiser employees at Ballantine, Budweiser took the position that "reciprocity" no longer applied. Deposition of Horst Poeschla at 170, 176.

The Budweiser Plan, effective June 1, 1973, provided that past service in the industry was credited for benefit purposes if the employee was on the seniority list of Budweiser as of that date. Budweiser Pen-

sion Plan, Article I, §§ 6, 13 (Exhibit A annexed to Afft. of Horst Poeschla (May 10, 1978)). Thus, the service of the "Michota" plaintiffs was not counted for benefit purposes under the Budweiser Plan. In October 1973, a document which appears to have been an amendment to the 1973–1976 Budweiser CBA was signed. That document, executed by the Unions and Budweiser, required an "unattached regular" to work 225 days in any 52 consecutive weeks before being placed on Budweiser's seniority list. The purpose of this agreement was "to formulate an approach" to placing unattached regulars on the seniority list at some future point. Deposition of Horst Poeschla at 169. Plaintiffs claim that this "agreement" was not part of the CBA and was never submitted for ratification by the union membership. Third Supp. Afft. of Bruno Michota (May 11, 1978).

The "Michota" plaintiffs, in various portions of the complaint, allege that the failure of Budweiser to add the "Michota" plaintiffs to its seniority list violated the 1970–1973 Budweiser CBA. Complaint ¶¶ 33, 40. Additionally, in an apparent reference to the October 18, 1973 agreement, the "Michota" plaintiffs allege that "Budweiser unilaterally altered and amended the terms ... upon which plaintiffs could become regular employees for the purpose of retaining credited service" in violation of the 1970–1973 Budweiser CBA. Complaint ¶ 50. The "Michota" plaintiffs seek, in essence, a declaration that they are entitled to a pension under the Budweiser Plan with full credit for benefit purposes for all service in the industry.

It is undisputed that none of the "Michota" plaintiffs ever submitted this dispute to the grievance and arbitration procedures provided in the applicable CBA. Budweiser argues that these allegations of the complaint fall squarely within the grievance and arbitration procedures of the 1970–1973 Budweiser CBA. Under the circumstances, Budweiser contends that the failure to arbitrate these grievances operates as a bar to this portion of the lawsuit under the doctrine of *Republic Steel Corp. v. Maddox*, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965).

In response, plaintiffs contend that the grievance and arbitration procedures were solely applicable to "wages, hours and working conditions" and did not apply to pension entitlement under the Budweiser Plan. Fifth Supp.Afft. of Bruno Michota ¶ 4(b) (June 2, 1980); Fourth Supp.Afft. of Bruno Michota, ¶ 4 (May 17, 1978). Secondly, the "Michota" plaintiffs argue that Budweiser failed to perform the preconditions, under the Budweiser Plan, to any arbitration. Fifth Supp.Afft. of Bruno Michota ¶¶ 5–16 (June 2, 1980); Fourth Supp.Afft. of Bruno Michota ¶¶ 2–3, 5 (May 17, 1978). Finally, plaintiffs argue that claims under ERISA are not subject to exhaustion of arbitration procedures prior to institution of a lawsuit.

█ I believe these issues must be resolved in favor of Budweiser. The complaint specifically alleges that Budweiser's actions were in violation of the 1970–1973 Budweiser CBA. Specifically, plaintiff's rely on the reciprocity provision contained therein. Afft. of Bruno Michota, ¶¶ 14, 17 (Mar. 14, 1978). In essence, the "Michota" plaintiffs claim that, under the 1970–1973 Budweiser CBA, they were wrongfully denied seniority status as of June 1, 1973. The 1970–1973 Budweiser CBA provided for arbitration of "any matter related to wages, hours of work or working conditions." Article IX, § 9.1(a). Seniority was covered in great detail in Article IV. The reciprocity provisions relied upon by the "Michota" plaintiffs were part of Article IV. Nothing in the Budweiser Plan indicated that the employer had any authority or exercised any discretion under the plan to add, subtract or otherwise modify the seniority provisions of the CBA. Budweiser, in its capacity as administrator of its pension plan, merely looked at the seniority list as of June 1, 1973 and had no authority to add or delete individuals from that list. Thus, although the decisions of the employer in administration of the Budweiser Plan were final under Article VII, § 1, the employer's actions with respect to the seniority list were, apparently, purely ministerial.

In denying the "Michota" plaintiffs a place on the seniority list, Budweiser clearly had adopted a specific interpretation of the seniority provisions of the Budweiser CBA. Deposition of Horst Poeschla at 157–164. Additionally, the October 1973 agreement was clearly regarded as an amendment to the 1973–1976 Budweiser CBA. Deposition of Horst Poeschla at 167. That agreement clearly adopted terms impacting on an employee's right to a place on the seniority list. The seniority list had significance beyond pension rights, impacting on an employee's shift selection, vacations, overtime and recall rights. Deposition of Horst Poeschla at 149–150. I believe, therefore, that an employee's right *vel non* to be placed on the Budweiser seniority list is clearly a "matter related to wages, hours of work or working conditions" under the grievance and arbitration procedures of the 1970–1973 Budweiser CBA. If any further authority is necessary, I refer to the well-established presumption in favor of the coverage of grievance and arbitration procedures. *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582–83, 80 S.Ct. 1347, 1352–53, 4 L.Ed.2d 1409 (1960). *See also Bressette Bros. v. International Talc Co., Inc.*, 527 F.2d 211, 216 (2d Cir. 1975) (dispute over pension provisions referred to arbitration under CBA despite separate arbitration provision in pension plan); *United Steelworkers of America v. General Steel Indus., Inc.*, 499 F.2d 215 (8th Cir. 1974) (dispute over continued pension benefits referred to arbitration since entitlement to benefits depended upon interpretation of "lay off" and "termination" terms of CBA). Since it is undisputed that the "Michota" plaintiffs have not availed themselves of the grievance and arbitration provisions of the CBA, *Republic Steel Corp., supra*, mandates that this portion of the action against Budweiser be dismissed.[24]

As noted above, the "Michota" plaintiffs suggest that the preconditions to any arbitration, specified in the Budweiser Plan, have not been followed by Budweiser thereby eliminating whatever obligation these plaintiffs may have had to pursue an arbitral remedy. Plaintiffs rely on Article I, § 13(e) of the Budweiser Plan which provides, in pertinent part,

> Each Employee on the seniority list of the Employer on the Effective Date shall be notified by the Employer, by certified mail, return receipt requested, addressed to him at his last known address as recorded with the Employer, of his Credited Service for Past Service as set forth in Annex B hereto. Each Employee added to the seniority list of the Employer after the Effective Date shall be notified by the Employer, by certified mail, return receipt requested, addressed to him at his last known address as recorded with the Employer of his Credited Service for vesting purposes only. If the Employee does not, within three months from the date of receiving such notice, notify the Employer in writing that he disputes or disagrees with such determination, it shall become binding upon the Employee and Employer for all time and for all purposes, except as such determination may be based upon any inaccurate or fraudulent statement made or procured by the Employee. If the Employee notifies the Employer that he disputes or questions its determination as set forth in the notice mailed to him, he will be given an opportunity for a hearing by the Employer. . . .

As far as I have been able to ascertain, "Annex B" was never promulgated. In March 1979, Mr. Michota received the certified letter referred to in § 13(e). Through his counsel, Mr. Michota registered his disagreement and noted that any hearing should be in the context of this litigation.

24. There is no hint of any allegation that the exceptions to the *Republic Steel Corp.* doctrine enunciated in *Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967) are applicable. There is no indication that Budweiser repudiated the 1970–1973 CBA, nor is there any allegation that the Unions breached their duty of fair representation to the "Michota" plaintiffs. *Id.* at 185–86, 87 S.Ct. at 914. Although the "Michota" plaintiffs contend that the October 1973 agreement was adopted without reference to the union membership, the unions are not named as defendants nor is the *Vaca* exception remotely suggested by the pleadings.

Fifth Supp.Afft. of Bruno Michota (June 2, 1980) and Exhibits annexed thereto.

■ I believe the "Michota" plaintiffs have misconstrued the obligation imposed on Budweiser by § 13(e). Section 13(e) does not require the employer to add or subtract employees from the regular seniority list or to take any action whatsoever with respect to that status. Nor does § 13(e) impose any obligation on Budweiser to inform employees that they were *not* on the seniority list as of June 1, 1973. Thus, the certified letter referred to in § 13(e) does not operate as a precondition to any arbitration with respect to an employee contending that he has been wrongfully excluded from the seniority list. Moreover, § 13(e) is perfectly consistent with the remaining terms of the plan. Only employees on the seniority list as of June 1, 1973 were entitled to past service credit for benefit purposes. Finally, under § 13(e) the "Michota" plaintiffs were entitled to notice only upon their addition to the seniority list and then, consistent with the plan, only as their credited service "for vesting purposes." The "Michota" plaintiffs contend that Budweiser is required to recognize their past service for benefit purposes as well. Thus, the letter referred to in § 13(e) has nothing to do with the substantive claims herein. Budweiser's failure to comply with its only duty to the "Michota" plaintiffs under § 13(e) adds nothing to this litigation. I, therefore, reject the contention that the "Michota" plaintiffs are absolved from invoking the arbitral process by virtue of Budweiser's failure to comply with § 13(e) of the Budweiser plan.

■ Finally, the "Michota" plaintiffs contend that claims under ERISA are not subject to arbitration as a precondition of suit. The alleged wrongful exclusion of the "Michota" plaintiffs from the Budweiser seniority list occurred before June 1, 1973. The alleged improper amendment to the CBA was executed in October 1973. ERISA was not generally effective until September 2, 1974. Thus, any liability of Budweiser based on the exclusion of the "Michota" plaintiffs from its seniority list is outside the scope of ERISA. Even assuming that ERISA is applicable to this aspect of the case, the authority is by no means clear with respect to the non-arbitrability of ERISA claims. The leading case so holding is *Lewis v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.,* 431 F.Supp. 271 (E.D.Pa.1977). *See also National Benefit Fund v. Presbyterian Hosp.,* 448 F.Supp. 136, 138 (S.D.N.Y. 1978) (dictum). Several cases have adopted a contrary view. *E. g., Air Line Pilots Ass'n., Int'l. v. Northwest Airlines, Inc.,* 627 F.2d 272 (D.C.Cir.1980) (compulsory arbitration procedures of Railway Labor Act, 45 U.S.C. § 151 *et seq.,* not preempted by ERISA); *de la Rosa Sanchez v. Eastern Airlines, Inc.,* 574 F.2d 29 (1st Cir. 1978) (same); *Scheider v. United States Steel Corp.,* 486 F.Supp. 211 (W.D.Pa.1980) (ERISA claims subject to intra-fund disputes procedure, citing *Republic Steel Corp. v. Maddox, supra*); *Lucas v. Warner & Swasey Co.,* 475 F.Supp. 1071 (E.D.Pa.1979); *Taylor v. Bakery & Confectionary Union & Industry Int'l. Welf. Fund,* 455 F.Supp. 816 (E.D.N.C.1978). As pointed out in *Scheider, supra,* 486 F.Supp. at 213, Congress apparently intended that ERISA claims arise "in similar fashion to those brought under" § 301 of the LMRA, 29 U.S.C. § 185. H.R. Conf.Rep.No. 93–1280, *reprinted* at [1974] U.S.Code Cong. & Ad.News, 2d sess., vol. 3, pp. 4639, 5106–5107. The *Republic Steel Corp.* case clearly mandates that an employee's § 301 suit is subject to exhaustion of available grievance and arbitration procedures. I believe the better view to be that espoused by those cases holding ERISA claims subject to exhaustion of arbitration proceedings. I note in passing that *Lewis, supra* did not involve a situation where, as here, the strong policy favoring arbitration of disputes under collective bargaining agreements was implicated.

· Based on the foregoing, I hold that the claims by the "Michota" plaintiffs against Budweiser on the second count of the complaint, as well as any other portion of the complaint, based upon violation of the 1970–1973 Budweiser CBA, is barred by failure of the "Michota" plaintiffs to resort

to the grievance and arbitration procedures contained in that CBA.[25]

## X

The sub-group of "Michota" plaintiffs, described as "Ballantine-Falstaff-Budweiser" plaintiffs, present a claim essentially predicated upon an alleged obligation of Falstaff to follow the Ballantine CBA. Complaint ¶¶ 28, 29, 51. The "Ballantine-Falstaff-Budweiser" plaintiffs contend that Falstaff assumed Ballantine's obligation to contribute on their behalf to the Brewery Plan, that Falstaff breached this obligation by making contributions into an escrow fund and that this action resulted in a forfeiture of the service credit of this group of plaintiffs.

The facts surrounding Falstaff's employment of the "Ballantine-Falstaff-Budweiser" plaintiffs have been summarized previously. A group of over 100 men worked for Falstaff from April to November 1972. At that point, they were terminated. Although Falstaff had previously agreed to follow the Ballantine CBA for a limited period, it then took the position that no CBA was in effect. The union locals commenced a lawsuit attempting to compel arbitration of these dismissals under the Ballantine CBA. In that action,[26] Judge Coolahan held that Falstaff was only required to arbitrate the question of the extent to which it was bound by the Ballantine CBA. See NLRB v. Burns Int'l. Security Services, Inc., 406 U.S. 472, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972). Apparently, that arbitration was never conducted.

Thereafter, Falstaff and the Unions entered into negotiations culminating in the execution of a CBA on June 5, 1973. The CBA was effective June 1, 1973 and had been ratified by a vote of the union membership. That CBA provided for the "supplemental list" referred to earlier. In late 1974, employment with Falstaff was offered to the individuals on the "supplemental list." None of the "Ballantine-Falstaff-Budweiser" plaintiffs accepted. It is undisputed that, had these individuals accepted, Falstaff would have recognized all of the individuals' credited service in the industry for purposes of the Falstaff plan.

Falstaff and the Unions had agreed in the 1973 CBA that Falstaff would follow the lead of Pabst with respect to pensions. That is, if Pabst remained a contributor to the Trust Fund so would Falstaff. If Pabst established its own plan, Falstaff would follow. Exhibit A annexed to Afft. of Henry A. Moran (Apr. 26, 1978). Pabst established its own plan effective June 1, 1973. Thereafter, Falstaff and the Unions entered into arbitration concerning Falstaff's pension obligations under the 1973 CBA. As part of the June 1974 arbitration award, Falstaff was directed to take the escrowed contributions made on behalf of its employees from April 2, 1972 and deposit those contributions in the newly-established Falstaff plan. Exhibit D annexed to Afft. of Henry A. Moran (Apr. 26, 1978)

Certain members of the Union were unsatisfied with the results of collective bargaining. In November 1973, Balback v. Teamsters Local 153, Civ. No. 1604–73 had been commenced. Thirteen of the 19 "Ballantine-Falstaff-Budweiser" plaintiffs were plaintiffs in Balback. Plaintiffs in Balback alleged, inter alia, that Falstaff had in several respects breached the Ballantine CBA and the Union (Local 153) had violated its duty of fair representation in the negotiations concerning the Falstaff CBA.[27] On

25. I do not believe that this holding impacts in any way my discussion with respect to the class relief sought in the fifth count. The "break-in-service" provision was not part of any CBA, application of its terms was solely a matter for the trustees and, most importantly, § 8.4 of the Trust Fund specifically provided that disputes "under this Trust or the Pension Plan" were not subject to the grievance procedure in the CBA.

26. Brewery Workers Joint Local Executive Bd. of N.J. v. Falstaff, Civ. No. 579–72.

27. A copy of the Amended Complaint in Balback is annexed as Exhibit A to the Afft. of Jeffrey M. Garrod (May 1, 1978).

February 24, 1977, I filed an opinion in *Balback, supra.*[28]

I rejected the *Balback* plaintiffs' contention that Falstaff had breached the Ballantine CBA by making pension contributions into escrow rather than to the Trust Fund. *Balback, supra* at 7.[29] With respect to pensions, I commented

> Nor were the plaintiffs deprived of eligibility for industry plan pension rights when FBC contributed pension monies into an escrow fund rather than into the industry pension fund. FBC's use of an escrow fund had no effect on plaintiffs' eligibility for a pension.[5] Plaintiffs lost their original seniority status for the purposes of fringe benefits only when they refused to accept employment off the supplemental list. While plaintiffs may well have lost pension benefits when they were legally terminated before their pension rights vested, this hardship does not result from a breach of contract by FBC.

*Id.*[30] I also found that Local 153 had not breached its duty of fair representation to plaintiffs. *Balback, supra* at 8–10. Judgment in favor of Falstaff and Local 153 was entered on March 11, 1977. The judgment was affirmed by Judgment Order of the Court of Appeals for the Third Circuit on February 14, 1978. The arbitration award of June 1974 was not specifically challenged in *Balback* or, to my knowledge, in any other forum.

In opposition to the Falstaff motion, the "Ballantine-Falstaff-Budweiser" plaintiffs argue that Balback was a " 'fair representation case' " rather than a pension case. Supp.Afft. of Walter Lemke, ¶ 5 (May 11, 1978). It is contended that the pension

issue was not presented in *Balback*, and that the rights of plaintiffs under the Brewery Plan were not litigated. Supp. Afft. of Walter Lemke (May 11, 1978). The plaintiffs also find support in the above-quoted excerpts from the text and footnotes of my opinion in *Balback.*

■ I believe the contentions of the "Ballantine-Falstaff-Budweiser" plaintiffs must be rejected. In *Balback*, plaintiffs clearly alleged that Falstaff's actions had resulted in a loss of pension rights. Amended Complaint ¶¶ 12–13 (annexed as Exhibit A to Afft. of Jeffrey Garrod (May 1, 1978)). The relief requested therein sought "restoration of . . . pension rights, including the contributions of retroactive payments to restore [plaintiffs] to their rightful positions within the pension plan," or, alternatively, arbitration on the same issue. I decided in *Balback* that Falstaff, assuming it had assumed Ballantine's CBA with respect to pension, had not breached those obligations by paying the funds into an escrowed account. *Balback, supra* at 7. The Judgment Order entered by the Third Circuit clearly indicated that the correctness of this decision was raised on appeal. The Third Circuit affirmed. The allegations of the complaint herein with respect to Falstaff are indistinguishable. Complaint ¶¶ 28, 29, 51. Thirteen members of the "Ballantine-Falstaff-Budweiser" group of plaintiffs were also plaintiffs in *Balback.* With respect to these individuals, res judicata/collateral estoppel principles clearly preclude relitigation. The remaining six "Ballantine-Falstaff-Budweiser" plaintiffs were members of Local 153 at the time of *Balback.* I found that Local 153 had not breached its duty of fair representation.

**28.** A copy of this opinion is annexed as Exhibit D to the Afft. of Jeffrey M. Garrod (May 1, 1978).

**29.** I assumed, *arguendo*, that Falstaff had adopted the Ballantine CBA with regard to pensions. *Balback, supra* at 7.

**30.** In footnote 5, I stated

> It appears that under the new collective bargaining agreement between Local 153 and [Falstaff], the Company is to make retroactive payments from April 1, 1972 to the in-

dustry pension plan. . . . Since there is no showing that [Falstaff] did not perform this obligation, it does not appear how plaintiffs could have been damaged by [Falstaff's] temporary contribution to the escrow fund.

The "Ballantine-Falstaff-Budweiser" plaintiffs place reliance upon this footnote and the textual material quoted above in asserting that *Balback* did not in any way determine the rights of those individuals to pensions from the Brewery Plan. *See* Supp.Afft. of Walter Lemke ¶¶ 13–15 (May 11, 1978).

That determination was affirmed on appeal. I must, therefore, assume that those six individuals did not consider the actions of Local 153 antagonistic and that that organization was an adequate representative of their interests. *See Bolden v. Pennsylvania St. Police*, 578 F.2d 912, 918 (3d Cir. 1978). I believe, therefore, that these six individuals, having been Local 153 members without antagonistic interests to the union, are likewise bound by the determination in *Balback. Id.*

Besides the alleged breach of the Ballantine CBA in Falstaff's payment of pension contributions into escrow, the "Ballantine-Falstaff-Budweiser" plaintiffs contend that deposit of these contributions into the Falstaff plan rather than the Trust Fund was wrongful. Complaint ¶ 51. This action by Falstaff was ordered as part of an arbitration award in June 1974. Exhibit D annexed to Afft. of Henry A. Moran (Apr. 26, 1978). Local 153 and Falstaff were parties to the arbitration, which was conducted under the auspices of the New Jersey State Board of Mediation. All of the "Ballantine-Falstaff-Budweiser" plaintiffs were members of Local 153. The award of the arbitrator was not challenged in · *Balback* which was tried in April and May 1976, decided in February 1977 and affirmed in February 1978. As far as I have been able to ascertain, this arbitration award was not challenged in any other forum. Indeed, the award has not been challenged in this case. The time for any party to seek vacation of the award has long since passed. *See* 9 U.S.C. § 9 (one year from award); N.J.S.A. 2A:24–7 (three months from award). Under the circumstances, Local 153 was the duly constituted representative of the "Ballantine-Falstaff-Budweiser" plaintiffs in the arbitration and, therefore, these individuals are bound by that award. Accordingly, I find that the "Ballantine-Falstaff-Budweiser" plaintiffs are precluded by the June 1974 arbitration award from challenging the propriety of Falstaff's deposit of the escrowed funds in the Falstaff plan, rather than the Trust Fund. *Panza v. Armco Steel Corp.*, 316 F.2d 69 (3d Cir.), *cert. denied*, 375 U.S. 897,

84 S.Ct. 174, 11 L.Ed.2d 125 (1963). Res judicata effect is clearly accorded on unchallenged arbitration award such as the award presented herein. *See, e. g., United States for and on behalf of Portland Construction Co. v. Weiss Pollution Control Corp.*, 532 F.2d 1009, 1012 n. 3 (5th Cir. 1976).

The "Ballantine-Falstaff-Budweiser" plaintiffs contend that *Balback* was a "fair representation case rather than a "pension case." Supp.Afft. of Walter Lemke (May 11, 1978). It is contended that *Balback* did not purport to decide the entitlement *vel non* of plaintiffs in that case to pensions under the Brewery Plan. I believe that this assertion misses the point. The factual underpinnings of the claims asserted against Falstaff are breach of the Ballantine CBA and deposit of the escrowed funds in the Falstaff plan. Both of these matters were previously litigated; the former in *Balback*, the latter in an unchallenged arbitration proceeding. The fact that the theory of liability has been changed from "unfair representation" to a "pension" suit makes no difference. *See Clemens v. Central R.R. Co. of N.J.*, 399 F.2d 825 (3d Cir. 1968), *cert. denied*, 393 U.S. 1023, 89 S.Ct. 633, 21 L.Ed.2d 567 (1969).

In accordance with the above, summary judgment will be entered in favor of defendant Falstaff on all elements of the complaint applicable to Falstaff.

## CONCLUSION

For the foregoing reasons, the motion of the PBGC for summary judgment will be denied. The motion for summary judgment of the plaintiff class with respect to the fifth count will be granted. The motion for summary judgment by Budweiser, Pabst, Falstaff and Rheingold will be granted.

An order in conformity with this opinion is to be submitted by plaintiffs' counsel, with consent as to form, if possible, within 15 days of the date hereof.